UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re:<br><br>**ZAIS INVESTMENT GRADE LIMITED VII,**<br><br>**Debtor.** | : | **Civ. Action No. 11-cv-05064**<br>**Chapter 11**<br><br>**B. Ct. Case No. 11-20243 (RTL)** |
| **HILDENE CAPITAL MANAGEMENT HILDENE OPPORTUNITIES MASTER FUND, LTD**<br>**Appellants,**<br>**v.**<br><br>**GRF MASTER FUND, L.P., ANCHORAGE ILLIQUID OPPORTUNITIES OFFSHORE MASTER, L.P. AND ANCHORAGE CAPITAL MASTER OFFSHORE, LTD.,**<br>**Appellees.** | : | |

# OPENING BRIEF OF HILDENE CAPITAL MANAGEMENT AND HILDENE OPPORTUNITIES MASTER FUND, LTD.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Jon Pickhardt (NY Bar No. JP 8590)
Scott C. Shelley (NJ Bar No. SS-1013)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Telecopier: (212) 849-7100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Eric D. Winston (Cal. No. 202407)
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Telecopier: (213) 443-3100

*Counsel to Hildene Capital Management and Hildene Opportunities Master Fund, LTD*

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT ....... 1

II. STATEMENT OF APPELLATE JURISDICTION ....... 3

III. STATEMENT OF ISSUES AND STANDARD OF REVIEW ....... 4

IV. STATEMENT OF THE CASE ....... 5

A. Nature of the Case and Proceedings Below ....... 5

B. Factual Background ....... 8

1. The Debtor, The Issuance Of The Notes And The Indenture Governing The Relationships Between The Note Holders ....... 8

C. ZIGL's Default And Note Acceleration ....... 12

D. Anchorage's Post-Default Note Purchases And Failed Contractual Liquidation Efforts ....... 13

E. Anchorage Abandons The Contractual Reorganization Under The Indenture And Launches The Involuntary Petition ....... 15

V. ARGUMENT ....... 18

A. The Bankruptcy Court Erred By Holding That A Party In Interest Lacks Standing To Raise A Petitioning Creditor's Eligibility to Commence an Involuntary Case to Show Bad Faith Under 11 U.S.C. § 1112. ....... 18

B. The Bankruptcy Court Should Have Dismissed The Petition As A *Per Se* Bad Faith Filing Because Petitioners Were Non-Recourse Creditors Who Are Not Eligible To Commence An Involuntary Action ....... 25

C. The Totality Of Circumstances Demonstrates Bad Faith ....... 31

1. The Petition Was Filed To Circumvent Express Provisions Of The Indenture ....... 31

2. The Bankruptcy Court Erred By Refusing to Enforce the Indenture Under Bankruptcy Code Section 510(a) ....... 38

VI. CONCLUSION ....... 40

# TABLE OF AUTHORITIES

**Page**

## CASES

*In re 801 South Wells Street L.P.*,
192 B.R. 718 (Bankr. N.D. Ill. 1996) ....................................................19, 33, 34

*In re 680 Fifth Ave. Assocs.*,
156 B.R. 726 (Bankr. S.D.N.Y. 1994)..............................................................26

*In re Allen-Main Assocs. Ltd.*,
223 B.R. 59 (2d Cir. BAP 1998) ..........................................................26, 27, 28

*Baker v. Latham Sparrowbush Assoc. ( In re Cohoes Indus. Terminal, Inc.)*,
931 F.2d 222 (2d Cir.1991) ..........................................................................19

*Basin Elec. Power Coop. v. Midwest Processing Co.*,
47 B.R. 903 (D.N.D. 1984), *aff'd*, 769 F.2d 483 (8th Cir. 1985) .......................33

*BNP Paribas Mort. Corp. v. Bank of Am., N.A.*,
--- F.Supp.2d ---, 2011 WL 1210208 (S.D.N.Y. 2011).....................................24

*In re Better Care, Ltd.*,
97 B.R. 405 (Bankr. N.D. Ill. 1989) .................................................................33

*Bourke v. Dun & Bradstreet Corp.*,
159 F.3d 1032 (7th Cir. 1998) ..........................................................................5

*In re Brown*,
916 F.2d 120 (3d Cir. 1990) ............................................................................3

*C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*,
113 F.3d 1304 (2d Cir. 1997) ..........................................................................19

*Counties Contracting & Constr. Co. v. Constitution Life Ins. Co.*,
855 F.2d 1054 (3d Cir. 1988) ..........................................................................29

*In re East-West Assocs.*,
106 B.R. 767 (Bankr. S.D.N.Y. 1989)...............................................................27

*In re Erickson Retirement Communities, LLC*,
425 B.R. 309 (Bankr. N.D. Tex. 2010)........................................................38, 39

*In re Integrated Telecom Express, Inc.*,
384 F.3d 108 (3d Cir. 2004) ......................................................................31, 32

*Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re Ion Media Networks, Inc.)*,
419 B.R. 585 (Bankr. S.D.N.Y. 2009)...............................................................38

*Landon v. Hunt*,
977 F.2d 829 (3d Cir. 1992) ....................................................................33

*In re Law Ctr.*,
261 B.R. 607 (Bankr. M.D. Pa. 2001) ....................................................32

*In re Marketxt Hldgs. Corp.*,
347 B.R. 156 (Bankr. S.D.N.Y. 2006).....................................................24

*In re QDN, LLC*,
363 F. App'x 873 (3d Cir. 2010)..............................................................21

*Paradise Hotel Corp. v. Bank of Nova Scotia*,
842 F.2d 47 (3d Cir. 1988) .......................................................................25

*In re Phoenix Piccadilly, Ltd.*,
849 F.2d 1393 (11th Cir. 1988) ...........................................................20, 21

*PPM Finance, Inc. v. Norandal USA, Inc.*,
392 F.3d 889 (7th Cir. 2004) .......................................................................5

*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999) ............................................. 3, 4, 5, 19, 20, 31, 32

*In re Silverman*,
230 B.R. 46 (Bankr. D.N.J. 1998) ............................................................33

*In re Skyworks Ventures, Inc.*,
431 B.R. 573 (Bankr. D.N.J. 2010) ..........................................................30

*In re TCI 2 Hldgs., LLC*,
428 B.R. 117, But Bankruptcy Code section 1129 (b)(1...................................39

*In re Westville Distrib. & Transp.*,
293 B.R. 101 (Bankr. D. Conn. 2003).....................................................22, 23

## STATUTES/RULES

11 U.S.C. § 101(13) ..........................................................................................25

11 U.S.C. § 101(41) ..........................................................................................25

11 U.S.C. § 102(2) ........................................................................................26, 27

11 U.S.C. § 303 .............................................................................................23, 27

11 U.S.C. § 303(b) ..............................................................................1, 25, 26, 27

11 U.S.C. § 303(b)(1)..........................................................................................19

11 U.S.C. § 303(d) ........................................................................................19, 21

11 U.S.C. § 303(h) ...............................................................................................5

11 U.S.C. § 502 ....................28
11 U.S.C. § 502(a) ....................28
11 U.S.C. § 510(a) ....................3, 4, 5, 8, 38, 39
11 U.S.C. § 1104 ....................39
11 U.S.C. § 1104(a)(3) ....................18
11 U.S.C. § 1111(b) ....................28
11 U.S.C. § 1111(b)(1)(A) ....................28
11 U.S.C. § 1112 ....................4, 18
11 U.S.C. § 1112(b) ....................1, 3, 4, 18, 20
11 U.S.C. § 1112(b)(4) ....................18
11 U.S.C. § 1123(b)(2) ....................35
11 U.S.C. § 1125 ....................15
11 U.S.C. § 1129(a) ....................39
11 U.S.C. § 1129(b) ....................4, 39
11 U.S.C. § 1129(b)(1) ....................39
28 U.S.C. § 158(a) ....................3
Fed. R. Bankr. P. 1011 ....................21, 22
Fed. R. Bankr. P. 1009(a) ....................23

**MISCELLANEOUS**

Resnick & Sommer, 2 *Collier on Bankruptcy* at ¶ 303.12[3] (16th ed.) ....................26
H.R. Rep. No. 595, at 406, *reprinted in* 1978 U.S.S.C.A.N. 5963, 6362 ....................18

Hildene Capital Management and Hildene Opportunities Master Fund, LTD (collectively, "Hildene" or "Appellants") respectfully submit this Opening Brief.[1]

## I. PRELIMINARY STATEMENT

This is an appeal from a landmark ruling of the Bankruptcy Court of this District – it represents the first time a creditor successfully placed a collateralized debt obligation vehicle ("CDO") into an involuntary bankruptcy in the United States. Such a result is remarkable because CDOs were designed to be financing vehicles that are bankruptcy remote, and tens of billions of dollars of notes have been issued by CDOs to pension funds, insurance companies, and other major institutional investors on that basis. The Bankruptcy Court's ruling cannot be allowed to stand, because it erroneously endorsed an involuntary petition by senior secured *nonrecourse* creditors who were ineligible under 11 U.S.C. § 303(b), and whose conduct overwhelmingly supported a finding of bad faith under 11 U.S.C. 1112(b).

The CDO at issue here is known as Zais Investment Grade Limited VII ("ZIGL"). Anchorage[2] commenced the case knowing that it held only secured non-recourse claims against ZIGL. Secured non-recourse creditors are ineligible

---

[1] All references to the Bankruptcy Court's docket are "B. Ct. Dkt. __." Any reference to this Court's docket is "D. Ct. Dkt. __."

[2] "Anchorage" refers to the three petitioners, funds managed by Anchorage Capital Group, L.L.C.

under the Bankruptcy Code to be the only petitioning creditors to file an involuntary petition. Because ZIGL did not contest the Involuntary Petition (apparently having agreed with Anchorage in advance not to do so), the Bankruptcy Court never considered the issue, but held instead that Hildene lacked standing to raise it, even in connection with its request for dismissal of the case as a "bad faith" filing under Bankruptcy Code section 1112(b). But nothing in the Bankruptcy Code prevents a bankruptcy court from considering all factors in the "totality of the circumstances" test required by Bankruptcy Code section 1112(b), and the filing by an ineligible creditor is *per se* bad faith requiring reversal.

Even if there was no bad faith *per se*, the totality of the circumstances demonstrates bad faith supporting dismissal. Anchorage knowingly filed the Involuntary Petition to expedite the liquidation of ZIGL's collateral and escape a limitation in the governing Indenture that prohibited a liquidation absent the consent of 66.66% of all classes of noteholders. That alone constitutes a bad faith filing, because the law is well settled that a petitioning creditor cannot commence an involuntary bankruptcy case in order to obtain a strategic benefit or disproportionate advantage relative to other creditors.

Moreover, the Court allowed Anchorage to proceed with the involuntary petition notwithstanding a contractual provision expressly prohibiting Anchorage from doing so. In the event of default, the Indenture permitted Class A-1

Noteholders like Anchorage to exercise only those remedies that could be exercised by the Indenture Trustee. Section 5.4(d) of the Indenture expressly provided that the Indenture Trustee cannot file a bankruptcy case against ZIGL unless and until all Notes have been paid in full. The Bankruptcy Court's ruling does not address this issue at all.

Finally, the Indenture is a subordination agreement, and under Bankruptcy Code section 510(a), the Bankruptcy Court should have enforced the Indenture as requested by Hildene. The Bankruptcy Court declined to do so, relying on a wholly inapposite provision of the Bankruptcy Code.

For these reasons, as explained further below, Hildene respectfully submits that this Court should reverse the Bankruptcy Court's ruling, and remand with directions to dismiss the case.

## II. STATEMENT OF APPELLATE JURISDICTION

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 158(a). An appeal from an order denying a motion to dismiss pursuant to 11 U.S.C. § 1112(b) is a final order. *See In re Brown*, 916 F.2d 120, 124 (3d Cir. 1990); *In re SGL Carbon Corp.*, 200 F.3d 154, 159 (3d Cir. 1999).

## III. STATEMENT OF ISSUES AND STANDARD OF REVIEW

1. Whether the Bankruptcy Court erred in concluding that Appellants lacked standing to challenge petitioners' eligibility as a basis for dismissal for "cause" under 11 U.S.C. § 1112.

2. Whether the Bankruptcy Court erred in rejecting Appellants' claim that the bankruptcy petition was *per se* filed in bad faith under 11 U.S.C. § 1112 because it was improperly filed by secured (rather than unsecured) creditors.

3. Whether, even if there is no *per se* bad faith under 11 U.S.C. § 1112 as a result of the filing creditors' ineligibility, the Bankruptcy Court erred in disregarding other circumstances that show that the filing was in bad faith, including (a) that the petition was filed notwithstanding contractual provisions prohibiting such filing; and (b) that the petition was filed to circumvent express contractual provisions requiring super-majority votes of all noteholders in order to authorize the sort of liquidation of assets petitioning creditors seek to accomplish through the bankruptcy court.

4. Whether, in refusing to enforce the Indenture under Bankruptcy Code section 510(a), the Bankruptcy Court erred by relying on an inapposite provision, 11 U.S.C. § 1129(b), which applies only to "cramdown" bankruptcy plans.

An order denying a motion to dismiss under 11 U.S.C. § 1112(b) is reviewed for abuse of discretion. *SGL Carbon*, 200 F.3d at 159. An abuse of discretion

exists where the trial court's decision rests on a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact. *Id.* In considering a determination under section 1112(b), the court "reviews the findings of fact leading to the decision for clear error and exercises plenary review over the court's conclusions of law." *Id.* While Hildene bore the burden of establishing "cause" for dismissal under Bankruptcy Code section 1112(b), once good faith is at issue, the burden fell on Anchorage to establish that the Involuntary Petition had been filed in good faith. *See id.* at 162 n.10.

The Bankruptcy Court's refusal to apply Bankruptcy Code section 510(a) is reviewed *de novo*. This is because a district court's interpretation of a subordination agreement is a legal question and is therefore reviewed *de novo*. *PPM Finance, Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 892 (7th Cir. 2004); *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998).

## IV. STATEMENT OF THE CASE

### A. Nature of the Case and Proceedings Below

On April 1, 2011, the three Anchorage funds, each a holder of secured non-recourse debt, commenced this case by filing the Involuntary Petition. *See* B.Ct. Dkt. 1. No other creditor joined the Involuntary Petition. ZIGL neither contested the Involuntary Petition nor consented to it. Pursuant to 11 U.S.C. § 303(h), by

virtue of ZIGL's failure to contest the Involuntary Petition, the Bankruptcy Court entered an order for relief on April 26, 2011. *See* B.Ct. Dkt. 8.

On May 23, 2011, Hildene filed the Motion to Dismiss (“Motion”). B.Ct. Dkt. 46. Among other things, Hildene argued that the petition should be dismissed for cause under section 1112 because it was not filed in good faith. Anchorage filed an opposition to the Motion, and Hildene filed a reply. B.Ct. Dkt. 105, 116.

Several parties joined the Motion, including Babson Capital Management, LLC (“Babson”), which represents the interests of a Class A-1 Noteholder, and Zais, the collateral manager. B.Ct. Dkt. 118, 107. The Class A-1 Notes held by Babson are at the same level as Anchorage. Unlike Anchorage, however, Babson was a "par" holder; it did not acquire Class A-1 Notes at a discount. Zais was the entity most familiar with the Debtor's collateral securities. The Debtor filed a statement, indicating that it took no position on the Motion to Dismiss. B.Ct. Dkt. 123. No party joined Anchorage in opposing the Motion to Dismiss.

The Bankruptcy Court heard the Motion to Dismiss on July 29, 2011. At the hearing, the Office of the United States Trustee (an arm of the United States Department of Justice that participates in all bankruptcy cases) did not take a position on the Motion to Dismiss, but did state: "Since the debtor is in essence acting as a neutral party, it would appear that dismissal may be warranted and this

office has no opposition to the case being dismissed." B.Ct. Dkt. 135 (July 29 Tr. at 50).[3]

The Bankruptcy Court denied the Motion to Dismiss, pursuant to the Opinion issued on August 26, 2011. *See* B.Ct. Dkt. 145 (hereinafter, the "Opinion") . Even though it asked virtually no questions on standing during the July 29 hearing, the Bankruptcy Court held that only ZIGL had standing to challenge Anchorage's eligibility to bring the petition, and therefore did not even consider the substantial arguments that Anchorage did not satisfy the requirements to bring an involuntary petition. Opinion at 10, 13.

The court rejected Hildene's argument that the bankruptcy case should be dismissed under section 1112 because it was filed in violation of express

---

[3] Subsequent to the July 29 hearing, the parties submitted post-hearing letter briefs to address the court's question: "Why does the Indenture have this provision that stops active management following acceleration?" *See* B.Ct. Dkt. 140-1, 141. Hildene explained that the Indenture by its very terms contemplated that by October 2010 the collateral manager would cease having authority to acquire new collateral securities. *Id.* at 2. This is because the Indenture confines the Collateral Manager's authority such that it may only purchase Collateral Securities "during the Reinvestment Period." Indenture at 12.2 ("On any date during the Reinvestment Period, unless the Senior Notes have been accelerated following an Event of Default, the Collateral Manager on behalf of the Issuer may direct the Trustee to reinvest Principal Proceeds…in additional Collateral Securities…."); Indenture at 44-45 (definition of "Reinvestment Period"); *see also* Offering Circular at 14 ("During the Reinvestment Period, the Collateral Manager may cause the Collateral Securities to be purchased and sold.").

provisions of the Indenture and in order to secure an unfair advantage. The court also rejected Hildene's argument that the court was obligated under Bankruptcy Code section 510(a) to enforce the Indenture. Instead, notwithstanding that ZIGL has been paying noteholders in accordance with the terms of the Indenture for more than two years since it was declared in default, and has paid out tens of millions of dollars to Class A-1 Noteholders, the court concluded that the debtor was "in financial distress" which supported the filing of the petition. Hildene timely filed a notice of appeal. B.Ct. Dkt. 149. In addition, Babson has also filed a notice of appeal. B.Ct. Dkt. 154.

## B. Factual Background

### 1. The Debtor, The Issuance Of The Notes And The Indenture Governing The Relationships Between The Note Holders

ZIGL was incorporated on June 10, 2005, under the laws of the Cayman Islands. ZIGL is what is commonly referred to as a "CDO Squared" – a corporate vehicle that holds debts of other CDOs. On or about October 19, 2005, ZIGL issued notes (the "Notes") with a face amount of $365.5 million that have a stated maturity of October 15, 2040. The Notes were issued in eight tranches, with varying interest rates:

| Note Tranche | Face Amount |
|---|---|
| Class A-1A | $215,000,000 |

| Note Tranche | Face Amount |
|---|---|
| Class A-1B | $15,000,000 |
| Class A-2 | $27,000,000 |
| Class A-3 | $72,000,000 |
| Class B-1A | $7,000,000 |
| Class B-1B | $13,000,000 |
| Class B-2A | $4,000,000 |
| Class B-2B | $12,500,000 |

Indenture at 61.[4]

The proceeds of the Notes were to be used to acquire "Collateral Securities," which the Indenture define to mean a "CDO Security, Structured Finance Security, Synthetic Security or Repackage Security" that satisfied certain conditions. Indenture at 13.

The Notes are **non-recourse** obligations of the Issuer. *See* Indenture at 80 (§ 2.8(j)).[5] The Notes are secured by substantially all of the assets of ZIGL *See id.*

---

4 A copy of the Indenture was attached as Exhibit "G" to B.Ct. Dkt. 122.

5 Section 2.8(j) of the Indenture provides:

> (j) The obligations of the Issuer under the Senior Notes, the Composite Obligations and this Indenture are limited recourse obligations of the Issuer payable solely from the Assets and following realization of the Assets, and

at 1. No Noteholder individually holds a lien on the assets of ZIGL – only the Indenture Trustee holds a lien. *See id.* The Offering Circular used to market the Notes expressly stated that a risk factor associated with the Notes was that

> holders of the Notes must rely solely on distributions on the Collateral Securities and other assets pledged to secure the Senior Notes for payment on the Notes. If distributions on such Collateral Securities and assets are insufficient to make payment on the Notes, no other assets will be available for payment of the deficiency and all claims in respect of the Notes will be extinguished and shall not thereafter revive.

Offering Circular at 24.[6]

The Indenture provides for a detailed "waterfall" or "Priority of Payment" scheme with respect to payments to Noteholders. *See* Indenture at 161-66 (§ 11.1). There are 22 levels in the Priority of Payment scheme, and the scheme generally divides payments between interest payments and principal payments. However, if there is an event of default and acceleration of the Notes by the senior most class of Notes, the normal "priority of payments" scheme is altered. All cash received on account of the Debtor's assets must first be paid to (1) "senior expenses," (2)

---

> application of the proceeds thereof in accordance with this Indenture, all obligations of the Issuer and any claims against the Issuer under the Senior Notes, the Composite Obligations or this Indenture or arising in connection therewith shall be extinguished and shall not thereafter revive.

Class A-1 interest, and (3) Class A-1 principal until such time that Class A-1 Notes are paid in full. *Id.* at 171 (§ 13.1(a)).

The architecture of the Indenture, commonly used in CDO indentures, is designed to prevent rogue noteholders such as Anchorage, or even a class of noteholders, from taking unilateral action for their sole benefit. In particular, the Indenture places significant restrictions on individual Noteholders from taking action against ZIGL or the collateral securing the Notes, including restrictions on exercising remedies in the event of a default. The involuntary proceeding brought by Anchorage directly conflicted with two critical restrictions in the Indenture:

***First***, section 5.5 restricts the Indenture Trustee from disposing of any "Assets" unless one of two conditions have been satisfied: (1) the Indenture Trustee has determined, and a majority of the Controlling Class agrees, that the anticipated proceeds from a disposition of the Assets is sufficient to pay in full the Senior Notes (i.e., all Notes other than the Income Notes); or (2) at least 66.66% of <u>all</u> Noteholders (excluding the Income Noteholders) direct the sale and liquidation of the Assets. *See* Indenture at 98-99 (§ 5.5(a)). Moreover, section 5.13 expressly provides that a majority of the Controlling Class cannot cause a sale or disposition of assets absent complying with section 5.5. Here, as explained below, Anchorage

---

[6] A copy of the Offering Circular was attached as Exhibit "H" to B.Ct. Dkt. 122.

was unable to satisfy the 66.66% vote requirement, and used the bankruptcy process as a way of circumventing this contractual limitation.

***Second***, section 5.13 of the Indenture provides that a majority of the Controlling Class can cause "the institution of and direct the time, method and place of any Proceeding *for any remedy available to the Trustee*," but those rights cannot conflict with any express provision of the Indenture and cannot require the sale of Assets not in accordance with section 5.5(a) of the Indenture. *Id.* at 102 (§ 5.13) (emphasis added). Significantly, if the Notes have not been repaid in full, the Indenture expressly bars the Trustee from instituting any bankruptcy proceeding. *Id.* at 98 (§ 5.4(d)). Thus, the Indenture does not authorize the Controlling Class to put the Issuer, ZIGL, into bankruptcy. Yet that is precisely what the bankruptcy court's ruling permitted.

**C. <u>ZIGL's Default And Note Acceleration</u>**

On March 11, 2009, the Indenture Trustee served a notice of default on ZIGL. The event of default was not a default in the payment of principal or interest. Rather, it was a violation of section 5.1(g) of the Indenture, which provides for an event of default due to the failure to maintain a certain collateral coverage ratio. In its notice of default, the Indenture Trustee expressly stated that it would maintain the Assets intact in accordance with "section 5.5(a) of the Indenture unless and until the conditions precedent to the sale or liquidation of the

Assets have been satisfied." B.Ct. Dkt. 47, Ex. D (Notice of Default). The notice made express reference to the 66.66% Noteholder consent requirement to dispose of the Assets.

### D. **Anchorage's Post-Default Note Purchases And Failed Contractual Liquidation Efforts**

Anchorage filed its Involuntary Petition only after trying and failing to achieve its liquidation objectives in accordance with the terms of the Indenture. Anchorage first acquired, at a deep discount, $5 million face amount of Class A-1 Notes in October 2009. After making this small investment, sometime in late 2009 or early 2010, Anchorage began to consider a bankruptcy option for ZIGL. *See* B.Ct. Dkt. 116-1, Ex. "1" (filed under seal) (Tr. at 109:18-111:22, 112:20-113:15, 116:22-117:14). Anchorage also recognized in January 2010 that in order to liquidate the Collateral under the Indenture, it would need the consent of 66.66% of all classes of Notes. *See id.* at Ex. "2" (filed under seal).

In February 2010, Anchorage Capital acquired $100 million face amount of Class A-1 Notes. But rather than hold this investment to itself, Anchorage allocated the investment into three funds – the three Petitioning Creditors; three happens to be the minimum number of creditors for an involuntary bankruptcy petition of a debtor with 12 or more creditors. *See id.* at Ex. "1" (filed under seal) (Tr. at 131:13-132:2).

During the Summer of 2010, Anchorage actively investigated whether ZIGL could be the subject of a bankruptcy proceeding. *See id.* (filed under seal) (Tr. at 133:9-134:25). At the same time, the value of ZIGL's underlying assets was steadily increasing. Indeed, as Anchorage's investment analyst Yale Baron testified during his deposition, assets known as "Collateralized Loan Obligations" or "CLOs" may have been worth less than 10% of their face amount in early 2009, but by the end of 2010 easily could have had par value. *See id.* (filed under seal) (Tr. at 293:10-294:14).

In early November 2010 Anchorage met with ZIGL and provided a presentation that included a payment to "junior holders" in exchange for their participation. B.Ct. Dkt. 116-1, Ex. 3 (filed under seal). Anchorage proposed either a consent solicitation under the Indenture to liquidate ZIGL or a prepackaged chapter 11 plan. Anchorage understood that it needed 66.66% of each class in order to liquidate ZIGL's assets under the terms of the Indenture. The presentation also stated unequivocally that Anchorage viewed this proposal as a "model process for reorganizing similarly situated vehicles." To entice ZIGL's directors, Anchorage also proposed to provide exculpation, releases and indemnification for ZIGL's directors. *See id.* After the November 2010 meetings, ZIGL apparently informed Anchorage that ZIGL was barred from commencing a voluntary bankruptcy case.

## E. Anchorage Abandons The Contractual Reorganization Under The Indenture And Launches The Involuntary Petition

Anchorage decided not to pursue any consent solicitation under the Indenture. Instead, Anchorage began its feverish preparations for filing an involuntary case.[7] On January 19, 2011, Anchorage acquired $11.6 million face amount of Class A-1 Notes. Anchorage paid 67.13 cents on the dollar for the Class A-1 Notes, nearly double what it had paid for identical notes in February 2010.

On March 15, 2011, Anchorage launched its solicitation of a plan of reorganization for ZIGL that would transfer all of the value of ZIGL solely for the benefit of Class A-1A Notes and Class A-1B Notes, leaving nothing for the benefit of ZIGL's other noteholders (the "Anchorage Plan"). B.Ct. Dkt. 38. Accompanying the Anchorage Plan was a proposed disclosure statement (the "Anchorage Disclosure Statement").[8] B.Ct. Dkt. 39. There was no mention of

---

[7] In December 2010, Anchorage engaged Houlihan Lokey to conduct a valuation to be used in connection with an involuntary case that Anchorage was going to commence. In one December 23, 2010, e-mail, counsel for Anchorage instructed Houlihan Lokey that "we will need to share such valuation with the board of the issuer in advance of the filing to justify the board's decision *not to contest the involuntary*." B.Ct. Dkt. 116-1, Ex. 4 (filed under seal) (emphasis added). Thus, in December 2010, before any valuation had actually been prepared, Anchorage already knew that ZIGL would not contest the involuntary petition. As it turns out, there are no minutes of any board of director meeting indicating that the board of ZIGL considered whether to contest the Involuntary Petition. *See id.* (Shelley Dec. at ¶ 2).

[8] The Bankruptcy Code requires every chapter 11 plan to be accompanied by a disclosure statement that provides "adequate information." 11 U.S.C. § 1125.

whether ZIGL was eligible to be a debtor, whether the Anchorage entities were qualified to be petitioning creditors, and whether what Anchorage was attempting to do violated sections 5.5 and 5.13 of the Indenture.

The Anchorage Plan is premised on 100% of the amounts due to Class A-1 Notes (defined in the Anchorage Plan as "Senior Note Claims") being treated as secured claims, with no treatment for any purported unsecured deficiency claim.[9] The Anchorage Disclosure Statement discloses that as of February 4, 2011, the amount due to Class A-1 Notes was $191,086,932 – the identical amount of "Senior Note Claims" as defined in the Anchorage Plan. *See* B.Ct. Dkt. 39, at 10.

The record date for voting on the Anchorage Plan was March 9, 2011. On March 18, 2011, Anchorage bought another Class A-1 Note with a face amount of $1.85 million. While this amount was small compared to its prior purchases, it gave Anchorage another vote in favor of its plan – a vote that Anchorage knew could prove pivotal.[10] Because the purchase date was after the record date for

---

[9] Exhibit A to the Anchorage Plan defines "Senior Note Claims" as "all Claims for unpaid principal, interest and fees against the Debtor held by a Senior Noteholder on account of the Senior Notes, which Claims shall be deemed Allowed by the Plan in the aggregate amount of not less than $191,086,932." B.Ct. Dkt. 38-1 (Ex. A at 8). The term "General Unsecured Claims" is defined to exclude any claims of noteholders, including Class A-1 Claims.

[10] Unlike the Indenture, which required 66.66% of each class of notes to consent to a disposition of ZIGL's collateral, under Bankruptcy Code sections 1129(a)(8) and 1129(a)(10), Anchorage only needed one impaired consenting class in order to obtain confirmation. Bankruptcy Code section 1126(c) provides that a

voting, Anchorage directed the seller to vote in favor of the Anchorage Plan as a condition to the purchase. *See* B.Ct. Dkt. 116-1, Ex. 7 (filed under seal).

Having secured ZIGL's agreement not to oppose an involuntary petition, and after initiating their solicitation for the Anchorage Plan, on April 1, 2011, the three Anchorage funds commenced this case by filing the Involuntary Petition. *See* B.Ct. Dkt. 1. The Involuntary Petition did not attach the Indenture, any transaction documents relating to ZIGL, or Anchorage's Plan and Disclosure Statement. *Id.*

There is no evidence that Anchorage ever discussed with ZIGL, or mentioned in its Disclosure Statement, whether its funds were eligible petitioning creditors. Anchorage knew that it had only secured non-recourse claims when it filed the Involuntary Petition. When asked whether his "best understanding is that these are secured nonrecourse investments," Mr. Baron testified that they were. B.Ct. Dkt. 116-1, Ex.1 (filed under seal) (Tr. at 259-60).

Even though ZIGL has been in default, ZIGL's assets continue to generate substantial cash flow. Since ZIGL defaulted in early 2009, more than $45 million of principal and interest has been paid to Class A-1 Noteholders, including over $12 million in 2011, all from cash generated from the collateral. Notwithstanding the default, the Indenture has worked precisely as it is supposed to work, and tens

class accepts a plan if 66.66% of the dollar amount, and more than 50% of the number, of the claims *actually* voting accept the plan.

of millions of dollars have been paid to Class A-1 Noteholders. *See* B.Ct. Dkt. 127 (April 2011 Monthly Op. Rep.). In May 2011 alone, the Collateral generated over $2 million in proceeds. *See* B.Ct. Dkt. 116-2 (Jefferson Dec. at 5 (¶ 10)). Anchorage offered no evidence below that abiding by the terms of the Indenture outside of bankruptcy would in any way harm it, any other Class A-1 Noteholder, any other noteholder, or any other creditor of ZIGL.

## V. ARGUMENT

### A. The Bankruptcy Court Erred By Holding That A Party In Interest Lacks Standing To Raise A Petitioning Creditor's Eligibility to Commence an Involuntary Case to Show Bad Faith Under 11 U.S.C. § 1112.

Hildene requested that this Court dismiss the chapter 11 case pursuant to 11 U.S.C. § 1112(b),[11] which provides:

> (b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b).

[11] Hildene independently sought dismissal under Bankruptcy Code section 305, though for purposes of this appeal, Hildene is proceeding only under Bankruptcy Code section 1112.

Bankruptcy Code section 1112(b)(4) lists 16 specific examples of "cause," but the list is non-exclusive.[12] For example, it is well settled that a chapter 11 case may be dismissed for "cause" if it was not commenced in good faith. *See SGL Carbon*, 200 F.3d at 159-63. After reviewing the Bankruptcy Court's findings, this Court is to "examine the totality of facts and circumstances to determine whether they support a finding of good faith." *Id.* at 162.

Lack of good faith can be evidenced "if it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings." *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1309-10 (2d Cir. 1997) (quoting *Baker v. Latham Sparrowbush Assoc. ( In re Cohoes Indus. Terminal, Inc.),* 931 F.2d 222, 227 (2d Cir.1991)). Lack of good faith can also be demonstrated if the bankruptcy filing itself was improper or done for an improper purpose. *See, e.g., In re 801 South Wells Street L.P.*, 192 B.R. 718, 727 (Bankr. N.D. Ill. 1996).

The Bankruptcy Court committed legal error by holding that Hildene lacked standing to raise Anchorage's eligibility to bring an involuntary bankruptcy case as

---

[12] *See e.g.*, H.R. Rep. No. 595, at 406, *reprinted in* 1978 U.S.S.C.A.N. 5963, 6362 ("[The] list [contained in § 1112(b)] is not exhaustive. The court will be able to consider other factors as they arise, and to use it equitable powers to reach an appropriate results in individual cases.").

part of the "good faith" analysis under section 1112(b). First, the Bankruptcy Court relied on 11 U.S.C § 303(d), which permits a debtor, as part of contesting an involuntary petition, to challenge a petitioning creditor's eligibility.[13] The effect of this provision is that the alleged debtor has the exclusive right to contest the involuntary petition, and if it fails to do so, it waives eligibility issues thereafter. But nothing in section 303 suggests that parties in interest other than the debtor should be bound by the debtor's waiver when seeking dismissal *after* entry of the order for relief.[14] Such a rule would invite bad faith filings against a "letterbox" company such as ZIGL that is unlikely to contest an involuntary petition. *See* B.Ct. Dkt. 145 at 9.

---

[13] Bankruptcy Code section 303(b)(1) states: "An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 1 or 11 of this title—(1) by three or more entities, each of which is either a holder of a claim against such person . . . or an indenture trustee representing such holder, if such . . . claims aggregate at least 14,425 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims." 11 U.S.C. § 303(b)(1).

Section 303(d) provides that a "debtor, or a general partner in a partnership debtor that did not join the petition, may file an answer to a petition under this section." 11 U.S.C. § 303(d).

[14] The Bankruptcy Court asked only one question regarding standing during the July 29 hearing: "You're not asking me to vacate the order for relief." B.Ct. Dkt. 135 (July 29 Tr. at 24:16). When counsel explained that the answer was no, the court stated: "So I don't think you need to discuss why only a debtor can contest an involuntary." *Id.* at 24:20-21.

Nor is there anything in section 1112 that forecloses consideration of the petitioners' eligibility in determining whether the petition was brought in good faith. Section 1112(b) does not provide that it is subject to Bankruptcy Code section 303(d), and the definition of "cause" is inclusive, not exclusive. In *SGL Carbon*, the Third Circuit noted that the Eleventh Circuit in *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir. 1988), suggested that a court may consider "any factors which evidence an intent to abuse the judicial process and the purposes of the reorganization provisions or . . . factors which evidence an intent to abuse the judicial process and the purposes of the reorganization provisions or . . . factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *Id.* at 1394 (internal quotations and citations omitted). This broad scope of review includes a petitioning creditor filing a bankruptcy case knowingly it is ineligible.

The only authority cited by the Bankruptcy Court to support its standing ruling was *In re QDN, LLC*, 363 F. App'x 873, 875-76 (3d Cir. 2010), but that case did not address section 1112 at all. Instead, the Court held that Synergistic, a non-debtor that had received a preferential payment from the *QDN* debtor, lacked standing to object to a motion to appoint a trustee and to substitute the *QDN* debtor as debtor in an involuntary proceeding that had mistakenly named a different,

incorrect entity. Citing the well-settled rule that only a debtor has standing to contest an involuntary petition, the *QDN* court stated:

> Synergistic does not cite any authority that indicates it has standing to do anything more than bring the issue of subject matter jurisdiction to the court's attention. It is not the debtor, and therefore under 11 U.S.C. § 303(d) and Federal Rule of Bankruptcy Procedure 1011, it does not have the right to contest the involuntary petition on the merits. Indeed, the only reason Synergistic is contesting the involuntary petition appears to be to protect itself from having a preference voided by moving the petition date to a later date, the very situation Congress tried to avoid.

*Id.* at 876.

The facts of *QDN*, and the rationale for the Third Circuit's decision, simply have no application here. Unlike Hildene, Synergistic never moved to dismiss the case under section 1112, but instead tried to contest the petition itself. Further, the *QDN* debtor first contested the involuntary petition, and then filed its own voluntary case. *Id.* at 874. Here, ZIGL did neither. Moreover, the policy reasons for limiting standing to the debtor were directly implicated in *QDN* because the moving party was the recipient of a potentially avoidable preference payment. Those policy reasons are not undermined here because Hildene is in no way the recipient of a preferential payment; no junior noteholder received any payments prepetition. Finally, the only "defect" in *QDN* was a scrivener's error in the name on the involuntary petition. Here, the "defect" is substantive – a petitioning

creditor's eligibility. In short, nothing in *QDN* supports a standing limitation in the context of a motion under section 1112(b).

In reaching its decision, the Court in *QDN* distinguished *In re Westville Distrib. & Transp.*, 293 B.R. 101 (Bankr. D. Conn. 2003), a case where two individuals filed a purported voluntary case on behalf of a non-existent debtor, in order to try to force the real debtor into bankruptcy without complying with the provisions of section 303(d). When the real debtor filed a motion to dismiss, the United States Trustee filed a motion to convert the case to chapter 7 on the grounds that the real debtor had benefited from the automatic stay. Nonetheless, the bankruptcy court granted the motion to dismiss, holding that it would not permit an amendment of the voluntary petition to name the correct debtor. The court stated:

> Policy considerations also warrant denying the motion to convert. A good faith petition containing a scrivener's error might be amended by a filer, for example, to correct the spelling of a debtor's name. *See* Rule 1009(a), F.R.Bankr.P. That scenario is fundamentally different from an attempt by a non-filer to vitalize a non-existent entity and then force it into bankruptcy without observing the statutory predicates for involuntary cases, see § 303. Indeed, circumventing § 303 would invite abuse of the bankruptcy process and create an opportunity for procedural mischief.

*Westville*, 293 B.R. at 102.

The *Westville*' court's concern for abuse of the bankruptcy process targets precisely what has occurred here. Anchorage, knowing in advance that ZIGL would do nothing, filed the Involuntary Petition. At the time that it filed,

Anchorage knew it held only secured non-recourse claims. The ruling below legitimized this conduct. Indeed, if the Bankruptcy Court's no third party standing rule had been applied in *Westville*, the real debtor would not have had standing to seek dismissal of the fake debtor's case; only the fake debtor would have had standing. That cannot be right.[15]

In denying standing under section 1112, the Bankruptcy Court committed legal error, one that sets an unsettling precedent in future involuntary cases. Were this rule permitted to stand, so long as a debtor chose not to contest an involuntary petition,[16] no party in interest could ever seek to dismiss the case on the basis that the petitioning creditor acted improperly, and a bankruptcy court could never consider whether the petitioning creditors acted in bad faith by filing knowing they did not satisfy the eligibility requirements. Indeed, the logical result of the Opinion is that a person can file a petition even if that person is restricted by

---

[15] Not surprisingly, none of the cases Anchorage cited below precluded a party in interest from raising an invalid filing as grounds for dismissal under section 1112. *See* B.Ct. Dkt. 105. Indeed, one of Anchorage's cited authorities, *In re Marketxt Hldgs. Corp.*, 347 B.R. 156 (Bankr. S.D.N.Y. 2006), acknowledges that while a creditor lacks standing to contest an involuntary petition, a creditor can seek dismissal under sections 305 and 1112. *Id.* at 160 n.4. The Bankruptcy Court did not consider *Marketxt* in its Opinion.

[16] It is not hard to imagine a parade of horribles where an ineligible petitioning creditor and a debtor (or a debtor's insiders) reach an accommodation favorable to both whereby the ineligible petitioning creditor files the involuntary petition having already locked up the debtor's inaction.

contract from filing the involuntary petition or *even if the person does not hold a claim against the debtor*, as long as the debtor fails to contest the involuntary petition.[17] Such a rule cannot be allowed to stand.

### B. The Bankruptcy Court Should Have Dismissed The Petition As A *Per Se* Bad Faith Filing Because Petitioners Were Non-Recourse Creditors Who Are Not Eligible To Commence An Involuntary Action

Had the Bankruptcy Court considered the issue of Anchorage's eligibility, it likely would have dismissed the case. Bankruptcy Code section 303(b) provides in relevant part that an involuntary case

> against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 . . . by three or more entities, each of which is either a holder of a *claim against such person* that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, *if such noncontingent, undisputed claims aggregate at least $14,425 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims*". 11 U.S.C. § 303(b) (emphasis added).

Section 303(b) thus provides that only creditors holding unsecured claims may be qualifying petitioning creditors.[18] This requirement is buttressed by section

---

[17] Under section 510(a) (discussed in Section V(C)(2), *infra*, Hildene has standing to challenge Anchorage's efforts to do something forbidden by the Indenture and New York law. *See* Indenture at § 14.8 (all Noteholders are beneficiaries of rights under the Indenture); *cf. BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, --- F.Supp.2d ---, 2011 WL 1210208, *41 (S.D.N.Y. 2011) ("Plaintiffs' standing to sue under the Base Indenture and Security Agreement derives from their third-party beneficiary status as "Noteholders").

303(b)'s use of the phrase "claim against such person." An involuntary case is commenced against a "person" by creditors holding claims against that "person." An involuntary case is not commenced against a debtor. The Bankruptcy Code separately defines "person" and "debtor." *See* 11 U.S.C. §§ 101(13) and 101(41). Importantly, while the phrase "claim against the debtor" includes claims against the debtor and claims against property of a debtor, *see* 11 U.S.C. § 102(2), Bankruptcy Code section 303(b) does not use the phrase "claim against the debtor" but instead uses the phrase "claim against such person."

The natural consequence of only unsecured creditors being qualifying petitioning creditors is that creditors who hold only non-recourse claims cannot be qualifying petitioning creditors. That is because, as a matter of applicable non-bankruptcy law (here, New York), non-recourse creditors hold no rights against a person, but only rights against the property securing the obligations owed to the creditor. *See In re 680 Fifth Ave. Assocs.*, 156 B.R. 726, 732 n.8 (Bankr. S.D.N.Y. 1994).[19]

---

[18] Fully secured creditors can file an involuntary petition, but there still be must qualifying petitioning creditors. *See Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 49-50 (3d Cir. 1988).

[19] Even the leading treatise on bankruptcy states that a nonrecourse creditor may be a petitioning creditor only if "the other creditors hold unsecured claims that aggregate at least the amount specified in section 303(b) and are not contingent as to liability or subject to a bona fide dispute as to liability or amount." Resnick &

The rule that non-recourse unsecured creditors are not eligible petitioners was addressed in *In re Allen-Main Assocs. Ltd.*, 223 B.R. 59 (2d Cir. BAP 1998). There, an undersecured nonrecourse creditor filed an involuntary chapter 7 petition. At the time of the filing, the property securing the creditor's claim was less than the amount of the claim, and the deficiency exceeded the statutory minimum set forth in Bankruptcy Code section 303(b). The chapter 7 debtor answered the involuntary, claiming that the creditor was not an eligible petitioning creditor. The bankruptcy court dismissed the case, and the Second Circuit Bankruptcy Appellate Panel affirmed. The court held that in

> a chapter 7 case a nonrecourse creditor has no claim or right to payment of any deficiency from either the debtor or the property of the debtor. Code § 303 clearly requires that a sole petitioning creditor establish a right to payment of at least $10,000 above the value of its lien in order to be eligible to file an involuntary chapter 7 petition. [The petitioning creditor] has established no right to payment. This is true even if, as [the petitioning creditor] has suggested, it were to waive a portion of its secured claim.

*Id.* at 63.

Undoubtedly recognizing the bar to its eligibility under chapter 7, Anchorage sought relief under chapter 11. But secured non-recourse creditors lack eligibility under chapter 11 as well. As confirmed by *Allen-Main*, the Bankruptcy

---

Sommer, 2 *Collier on Bankruptcy* at ¶ 303.12[3] (16th ed.). Here, the only petitioning creditors are the Anchorage entities.

Code distinguishes between recourse and non-recourse claims,[20] and in the chapter 11 context a secured creditor has the right to elect to have a non-recourse claim be treated as a recourse claim. *See Allen-Main*, 223 B.R. at 63; *see also* 11 U.S.C. § 1111(b). But a section 1111(b) election applies only after a case has been commenced against a debtor; *i.e.*, the order for relief has been entered and a bankruptcy estate exists. It cannot be that a right that exists only in a chapter 11 bankruptcy case – a section 1111(b) election – should be the basis upon which a non-recourse creditor can qualify as a petitioning creditor to attempt to force a person into bankruptcy. That would be a classic case of "putting the cart before the horse." Section 1111(b) should be available only after a "person" has become a "debtor."[21]

---

[20] *But see In re East-West Assocs.*, 106 B.R. 767, 771 (Bankr. S.D.N.Y. 1989) (the "Bankruptcy Code makes no distinction between recourse and non-recourse claims; in fact . . . a claim 'against the debtor' under the Bankruptcy Code, 11 U.S.C. § 102(2), includes both claims against the debtor and claims against the property."). By focusing solely on Bankruptcy Code section 102(2), the court did not address the use of the phrase "against a person" that is used in Bankruptcy Code section 303. Thus, *East-West* incorrectly treats a claim "against the debtor" (which does include nonrecourse claims) as the same thing as a claim "against a person," which necessarily refers only to recourse claims.

[21] Treating section 1111(b) as applying only after the order for relief is entered is consistent with the claim allowance process. Section 1111(b) is triggered by the claim allowance process under Bankruptcy Code section 502. *See* 11 U.S.C. § 1111(b)(1)(A). Section 502(a) provides that a claim, proof of which is filed in accordance with section 501, is allowed unless a party in interest objects. Claims are not filed in a bankruptcy case, and are not allowed or disallowed, until after an order for relief is entered.

Even assuming section 1111(b) were otherwise available as a general matter, it could not apply on the facts here. The Anchorage Plan defines "General Unsecured Claims" to exclude "Senior Note Claims," which are the Class A-1 Claims held by Anchorage. *See* Anchorage Plan, Ex. A at 8. In other words, there are no unsecured deficiency claims asserted by Anchorage, which would be the result if section 1111(b) was available to Anchorage. Thus, prepetition Anchorage proposed, and solicited acceptances of, its Anchorage Plan premised on the proposition that no Class A-1 Noteholders would hold any general unsecured claims. Anchorage cannot, after being informed of its fatal flaw in the Involuntary Petition, *post hoc* justify its Involuntary Petition by belatedly converting a portion of its Class A-1 Claims into unsecured deficiency claims, which in any event would be in violation of the Indenture. Either Anchorage and the proposed class of Class A-1 noteholders under the Anchorage Plan have already made an election to have the entire class be treated as secured with no unsecured deficiency claims or Anchorage has waived any such rights pursuant to the Anchorage Plan that it solicited prepetition.

In addition, allowing secured non-recourse creditors to file involuntary petitions raises two troubling policy concerns. First, it would give non-recourse creditors rights that they would not have outside of bankruptcy. Bankruptcy generally does not enlarge the prepetition rights of debtors or creditors unless the

Bankruptcy Code expressly provides. *See Counties Contracting & Constr. Co. v. Constitution Life Ins. Co.*, 855 F.2d 1054, 1059 (3d Cir. 1988).

Second, it would create an incentive for savvy non-recourse creditors to file involuntary chapter 11 cases instead of chapter 7 cases even though there is no hope for a debtor to attempt to reorganize. Indeed, that is what is happening here. ZIGL defaulted two years ago, and is barred from acquiring any new Collateral Securities. ZIGL made no attempt to oppose the Involuntary Petition, and the Bankruptcy Court found that ZIGL "has no employees or officers and takes no role in the management of its assets. It merely exists." Opinion at 4. To the extent that ZIGL ever should have been forced into bankruptcy, the facts suggested a chapter 7 case. But because it is a non-recourse creditor, Anchorage could not be a qualifying petitioning creditor in a chapter 7 case, and instead has selected chapter 11 in order to circumvent those restrictions. That is *per se* bad faith. [22]

---

[22] By filing the Involuntary Petition holding only secured non-recourse claims, Anchorage acted in bad faith. But to the extent that such act does not warrant a *per se* finding of bad faith, Anchorage's complete failure to consider its standing supports a bad faith finding. Courts examining whether petitioning creditors acted in bad faith in commencing an involuntary petition often consider whether the petitioning creditor engaged in sufficient due diligence that all elements of the involuntary petition have been satisfied. In *In re Skyworks Ventures, Inc.*, 431 B.R. 573 (Bankr. D.N.J. 2010), the bankruptcy court found that "at the timing of the filing, [the petitioning creditors] knew that their claim was disputed as to liability and amount and that their standing to file an involuntary petition was highly questionable." *Id.* at 578. The court also stated that the petitioner's "efforts to determine if [the debtor] had more than twelve creditors

### C. The Totality Of Circumstances Demonstrates Bad Faith

#### 1. The Petition Was Filed To Circumvent Express Provisions Of The Indenture

The Third Circuit has held that "bankruptcy petitions are subject to dismissal unless filed in good faith." *SGL Carbon Corp.*, 200 F.3d at 160. The good faith standard "protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors and creditors with clean hands." *Id.* at 161.

In *SGL Carbon*, the Third Circuit confronted whether a debtor's voluntary chapter 11 petition should be dismissed where the case had been filed to frustrate the prosecution of civil antitrust claims against the debtor, which was financially sound on the petition date. The Third Circuit reversed the district court's denial of a motion to dismiss under section 1112(b). The court held that a "Chapter 11 petition is not filed in good faith unless it serves a valid reorganizational purpose." *SGL Carbon*, 200 F.3d at 165. Because the debtors' officers admitted that the

(which would have required at least three petitioners) was perfunctory." *Id.* Like the petitioner in *Skyworks*, Anchorage knew it held only non-recourse secured claims, which raised significant questions as to its standing. And like the petitioner in *Skyworks*, Anchorage engaging in virtually no diligence regarding its own eligibility – for example, Anchorage failed to even disclose the issue in its own Disclosure Statement. The principles applied by the court in *Skyworks Ventures* support dismissal here, and the court should have consistently applied its own published precedent.

petition was "filed solely to gain tactical litigation advantages," *id.* at 167, the Third Circuit determined that the case had to be dismissed.

Following *SGL Carbon*, in *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004), the Third Circuit again reversed an order denying dismissal under section 1112. Unlike the debtor in *SGL Carbon*, the *Integrated Telecom* debtor was out of business as of the petition date. The record demonstrated that the case was filed to take advantage of Bankruptcy Code section 502(b)(6)'s cap on lease rejection claims. While filing a bankruptcy case in order to take advantage of a provision of the Bankruptcy Code does not itself establish bad faith, the *Integrated Telecom* court held it also does not conclusively establish good faith. *Id.* at 128. Rather, the relevant inquiry is "(1) whether the petition serves a valid bankruptcy purposes, *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *Id.* at 119-20. The Third Circuit rejected the argument that the filing was in good faith because chapter 11 permitted an efficient distribution of value under the auspices of the Bankruptcy Code, holding that distribution alone is not a valid bankruptcy purpose. *Id.* at 127. Nothing in the record demonstrated that the value would increase if the case remained in

bankruptcy, or that the results could not be obtained under applicable nonbankruptcy law. *Id.*[23]

Numerous courts have held that an involuntary case should be dismissed when it was commenced by a creditor for its own benefit, instead of for the collective benefit of all creditors. *See 801 South Wells*, 192 B.R. at 727; *In re Better Care, Ltd.*, 97 B.R. 405, 411 (Bankr. N.D. Ill. 1989) ("An improper use of the Bankruptcy Code justifying a finding of bad faith will then exist any time a creditor uses an involuntary bankruptcy to gain a disproportionate advantage to

---

[23] The Bankruptcy Court purported to distinguish *SGL Carbon* on the grounds that the debtor in that case was not in financial distress, and distinguished *Integrated Telecom* on the grounds that the debtor's assets were sufficient to pay in full all claims, irrespective of whether Bankruptcy Code section 502(b)(6) applied, whereas in this case all Noteholders are unlikely to be paid in full. Opinion at 14. While both decisions concerned financially healthy debtors, the Third Circuit was clear that its rationale for imposing a good faith requirement on any chapter 11 petition was not limited to voluntary cases involving solvent debtors. *See Integrated Telecom*, 384 F.3d at 120 n.4; *see also In re Law Ctr.*, 261 B.R. 607, 612-13 (Bankr. M.D. Pa. 2001) (citing *SGL Carbon* and holding that "the Circuit has indicated that an involuntary bankruptcy petition lacking the statutory requirements will support a dismissal, a finding of bad faith, and appropriate sanctions upon the entity filing the petition. *Landon v. Hunt*, 977 F.2d 829, 833 (3d Cir. 1992)."). A financially healthy debtor filing a voluntary case in order give itself a windfall is no different than a senior creditor (who is getting paid in accordance with the terms of its contract) filing an involuntary petition in order to escape the limitations of its contract and cut off any future value for junior creditors. In both cases, the petitioner is seeking to use bankruptcy to further its own agenda, to the detriment of other creditors. In any event, the debtor here is hardly in "financial distress," as it has been paying proceeds to the Noteholders since the declaration of default, in full conformity with the terms of the Indenture.

that particular creditor's position, rather than to protect against other creditors obtaining a disproportionate advantage.").[24]

The *801 South Wells* court, in granting relief under both sections 305 and 1112(b), stated:

> Debtor has acknowledged that it has no intent to reorganize and take advantage of the “fresh start” policy of the Code. In light of the absence of unsecured creditors or debtor equity in the property the filing does nothing to ensure equity and equality among unsecured creditors. Equal and equitable treatment among the secured creditors was afforded by the State Court in its determination as to the relative priorities of their liens. Indeed, **the secured parties insured their own equitable treatment by virtue of the subordination and intercreditor agreements into which they entered**.

*801 South Wells*, 192 B.R. at 726 (emphasis added).

Applying these authorities, "cause" clearly exists for dismissal under section 1112(b). First, Anchorage filed the Involuntary Petition to avoid the Indenture's restrictions on the Indenture Trustee's ability to sell assets of ZIGL absent consent of all noteholders – a clear tactical advantage. As explained above, section 5.5 of the Indenture expressly requires that the Indenture Trustee cannot sell or dispose of

[24] *See also In re Silverman*, 230 B.R. 46, 53 (Bankr. D.N.J. 1998) ("Filing an involuntary petition with the intent to gain a strategic advantage, rather than to protect one's interest relative to other creditors or to prevent a dissipation of assets, constitutes an improper purpose."); *Basin Elec. Power Coop. v. Midwest Processing Co.*, 47 B.R. 903, 909 (D.N.D. 1984), *aff'd*, 769 F.2d 483 (8th Cir. 1985). The Bankruptcy Court did not address any of these authorities in the Opinion, especially *801 South Wells*, even though the facts in that case are similar

Collateral absent 66.66% consent of each class of Notes. Knowing that it would have to pay junior noteholders for that consent (which in Anchorage's view made a consent liquidation impractical), and desirous to prematurely liquidate the Collateral so that Anchorage could make a massively profitable return on its purchases of Class A-1 Notes, Anchorage simply ignored the Indenture's restrictions and filed the Involuntary Petition.

The Bankruptcy Court was untroubled by Anchorage's efforts to circumvent the Indenture, and cited sections 365(a) and 1123(b) of the Bankruptcy Code as somehow permitting this misconduct. Opinion at 14. But section 365 is a unique right that permits a bankruptcy estate the right to assume or reject an executory contract, subject to an opportunity for parties in interest to object, and subject to bankruptcy court approval. Section 1123(b)(2) is a provision that permits a plan of reorganization to provide for certain treatment notwithstanding contractual limitations. But like section 365(a), it requires bankruptcy court approval and the right for parties in interest to object. Each section is designed to protect a bankruptcy estate – *not to provide creditors with a weapon* – and each arises only after a bankruptcy case has been commenced. Neither section addresses the ability

---

to the facts here, and Hildene's counsel emphasized the decision at oral argument. See B.Ct. Dkt. 135 (Tr. at 8:5-21; 38:1-39:18; 41:11; 108:23-109:25).

of a creditor, notwithstanding the terms of a contract that limits its right, to commence an involuntary bankruptcy case.

Second, Anchorage filed the petition notwithstanding the express provisions of the Indenture which make clear that it lacked the authority to do so. Section 5.13 provides that the Class A-1 Noteholders may institute "Proceedings" after an event of default "for any remedy available to the Trustee." Indenture at § 5.13. But section 5.4(d) makes clear that the Trustee cannot commence an involuntary petition unless and until *all* Noteholders other than Income Noteholders have been paid in full. *See* Indenture at § 5.4(d). Thus, by incorporating the Trustee's remedies, section 5.13 prohibits Class A-1 Noteholders from the very action Anchorage was permitted to take in this case.

The Bankruptcy Court recognized that "the indenture prohibits the Trustee and junior noteholders from filing an involuntary petition against the debtor" (Opinion at 15), but rejected Hildene's argument because "Class A-1 noteholders are not mentioned in those provisions." *Id.* What the Bankruptcy Court failed to appreciate, however, is that the restrictions on the Trustee's ability to file an involuntary proceeding, contained in section 5.4(d), are made applicable to the Class A-1 noteholders through section 5.13. *See* B.Ct. Dkt. 122 (Indenture at 102

(§ 5.13)). Thus, the fact that section 5.4(d) does not expressly mention the Senior Noteholders is irrelevant.[25]

Finally, there was no evidence presented to the Bankruptcy Court that the commencement of this case by Anchorage benefitted any junior creditor or ZIGL. Indeed, the objections by Hildene, Babson (which represents a Class A-1 Noteholder), and Zais demonstrates that other parties in interest firmly believed that the filing was harmful. There is no valid reorganization purpose, since ZIGL is not reorganizing but, per the terms of the Anchorage Plan, instead will eventually be dissolved, and its assets (both prepetition assets and estate causes of action) are to be immediately transferred (without any auction process) to Anchorage's affiliate for the benefit of only Class A-1 Noteholders.

The Bankruptcy Court stated if junior creditors were already "out of the money" as of the Petition Date, "no other noteholders will be disadvantaged." Opinion at 14. But that statement relies on flawed logic. First, the Bankruptcy Court necessarily assumed (for purposes of the Involuntary Petition) that junior creditors were out of the money <u>and</u> had no valuable contract rights. But, at a minimum, junior creditors had the protections afforded under section 5.5 of the

---

[25] As for Section 13.1 of the Indenture, that provision is a temporal limitation preventing junior creditors from filing of an insolvency proceeding involuntary for a period of one year and one day after payment in full of senior

Indenture that ZIGL's collateral could not be liquidated at the whim of the senior creditors. Anchorage admitted that in order to obtain consent it likely would have to pay junior noteholders. Moreover, the Bankruptcy Court ignored the rights of Class A-1 Noteholders, like Appellant Babson, who did not agree that Anchorage could ignore the Indenture.

Second, the Bankruptcy Court effectively endorsed improper conduct. Under the Opinion, so long as all junior creditors are "out of the money," a bankruptcy case can survive a motion to dismiss notwithstanding the bad faith motives of the petitioning creditor. This is contrary to the well-established principle that whenever a petitioning creditor uses bankruptcy for its own purposes, instead of for the benefit of all creditors, it is acting improperly. *See supra*, note 24.

**2. <u>The Bankruptcy Court Erred By Refusing to Enforce the Indenture Under Bankruptcy Code Section 510(a)</u>**

Bankruptcy Code section 510(a) states: "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). It is undisputed that the Indenture is a "subordination agreement" within the meaning of section 510(a), and the Anchorage Plan seeks to enforce the Indenture's

---

creditors. Thus, it is logical that senior creditors would not be subject to this

subordination provisions (if only those it favors). *See* Anchorage Plan at § 3.1; *see also* Anchorage Disclosure Statement at 20. Accordingly, the Bankruptcy Court was obligated to enforce the Indenture in the same manner that it would be enforced under New York law, which is the undisputed applicable nonbankruptcy law. *See* Indenture at § 14.10 (New York choice of law provision).

Courts have routinely barred parties from invoking rights under the Bankruptcy Code if doing so violated the terms of a subordination agreement. *See, e.g. Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re Ion Media Networks, Inc.)*, 419 B.R. 585, 595-98 (Bankr. S.D.N.Y. 2009) (creditor subject to subordination agreement could not oppose plan of reorganization because agreement barred such opposition); *In re Erickson Retirement Communities, LLC*, 425 B.R. 309, 314-15 (Bankr. N.D. Tex. 2010) (enforcing subordination agreement to bar request for appointment of examiner under Code section 1104).

As explained above, the Indenture does not permit Anchorage to exercise a remedy that the Indenture Trustee could not exercise, and it cannot be disputed that the Indenture Trustee lacked the authority to file an Involuntary Petition. *See* Indenture at §§ 5.4(d), 5.13. Nevertheless, the Bankruptcy Court refused to enforce the Indenture under section 510(a), stating "[o]ne need only note that

---

provision – they have already been paid in full.

section 1129(b)(1) permits confirmation of a plan 'notwithstanding section 510(a).'" Opinion at 15 (quoting *In re TCI 2 Hldgs., LLC*, 428 B.R. 117, 139-41 (Bankr. D.N.J. 2010)). But Bankruptcy Code section 1129(b)(1) does not apply here. That provision concerns the confirmation of a plan of reorganization over the objection of a dissenting class of creditors, or what is commonly referred to as a "cramdown" plan. *See* 11 U.S.C. § 1129(b)(1). The Anchorage Plan is not a "cramdown" plan; it is proposed under section 1129(a). Moreover, commencing an involuntary case is not the same thing as seeking confirmation of a "cramdown" plan. Bankruptcy Code sections 303 and 1112 do not mention section 510(a), and section 510(a) itself is not limited. The refusal to enforce the Indenture under section 510(a) is an independent basis for reversal.

## VI. CONCLUSION

The facts and the law firmly demonstrate that this Court should reverse the Opinion and remand with directions to dismiss the case.

Dated: September 15, 2011
New York, New York

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

*Counsel for Hildene Capital Management and Hildene Opportunities Master Fund, LTD*

/s/ Scott C. Shelley
Scott C. Shelley