UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **In re:**<br><br>**ZAIS INVESTMENT GRADE LIMITED VII,**<br><br>**Debtor.** | : | **Civ. Action No. 11-cv-05064**<br>**Chapter 11**<br><br>**B. Ct. Case No. 11-20243 (RTL)** |
| **HILDENE CAPITAL MANAGEMENT, HILDENE OPPORTUNITIES MASTER FUND, LTD**<br>**Appellants,**<br>**v.**<br><br>**GRF MASTER FUND, L.P., ANCHORAGE ILLIQUID OPPORTUNITIES OFFSHORE MASTER, L.P. AND ANCHORAGE CAPITAL MASTER OFFSHORE, LTD.,**<br>**Appellees.** | : | |

# APPELLEES' BRIEF

WHITE & CASE LLP
J. Christopher Shore (JCS 6031)
Gerard Uzzi (GU 2297)
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

FOX ROTHSCHILD LLP
Richard M. Meth (RM 7791)
75 Eisenhower Parkway, Suite 200
Roseland, New Jersey 07068
Telephone: (973) 992-4800
Facsimile: (973) 992-9125

*Counsel to GRF Master Fund, L.P., Anchorage Illiquid Opportunities Offshore Master, L.P. and Anchorage Capital Master Offshore, Ltd.*

# TABLE OF CONTENTS


STATEMENT OF THE CASE ....................1

STATEMENT OF FACTS ....................4

**A.** The Indenture and the Notes ....................4

**B.** The Debtor's Need for Restructuring ....................5

**C.** The Petitioning Creditors ....................6

**D.** Events Leading to the Commencement of the Case ....................6

**E.** The Appellants ....................8

**F.** The Dismissal Motion and Order ....................9

STANDARD OF REVIEW ....................10

ARGUMENT ....................11

**I. –** THE BANKRUPTCY COURT PROPERLY FOUND THAT THIS BANKRUPTCY CASE WAS COMMENCED IN GOOD FAITH ....................11

**II. –** THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION BY DENYING THE MOTION TO DISMISS THIS CASE FOR "CAUSE" ....................13

**A.** The Qualifications of a Petitioning Creditor to Commence an Involuntary Case Are Not a Proper Basis for Dismissal After Entry of an Order for Relief ....................16

**B.** Hildene Lacks Standing to Contest the Petitioning Creditors' Qualifications to File a Petition against the Debtor ....................19

**C.** Policy Concerns Disfavor Hildene's and the Proposed Amicus's Positions ....................21

**D.** The Bankruptcy Petition Was, In Any Event, Properly Filed ....................22

1. A nonrecourse creditor may file an involuntary petition ....................23
2. The Petitioning Creditors did not violate the Indenture by commencing the involuntary case ....................27
3. The Appealed Order does not violate section 510(a) of the Bankruptcy Code ....................28

CONCLUSION ....................29

# TABLE OF AUTHORITIES

## CASES

ACLU v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471 (3d Cir. 1996)....10

Arbaugh v. Y & H Corp., 546 U.S. 500 (2006)....17, 18

CC Britain Equities, L.L.C. v. Allen-Main Assocs. Ltd. (In re Allen-Main Assocs. Ltd.), 223 B.R. 59 (B.A.P. 2d Cir. 1998)....25

Colonial Daytona Ltd. P'ship v. Am. Savs. of Fla., 152 B.R. 996 (M.D. Fla. 1993)....11

Commercial Credit Corp. v. Skutt, 341 F.2d 177 (8th Cir. 1965)....18

Cont'l Ill. Nat'l Bank & Trust Co. of Chicago v. Century City, Inc. (In re Century City, Inc.), 8 B.R. 25 (Bankr. D.N.J. 1980)....10

General Kontrolar Co. v. Allen, 124 F.2d 123 (6th Cir. 1941)....18

In re Balboa Street Beach Club, Inc., 319 B.R. 736 (S.D. Fla. 2005)....27

In re Barth, 109 B.R. 570 (Bankr. D. Conn. 1990)....18, 20

In re BDC 56 LLC, 330 F.3d 111 (2d Cir. 2003)....17, 18

In re Brown, 951 F.2d 564 (3d. Cir. 1991)....10

In re Central Jersey Airport Services, LLC, 282 B.R. 176 (Bankr. D.N.J. 2002)....27

In re Century Glove, Inc., 74 B.R. 958 (Bankr. D. Del. 1987)....26

In re Crown Vill. Farm, LLC, 415 B.R. 86 (Bankr D. Del. 2009)....11

In re East-West Assocs., 106 B.R. 767 (S.D.N.Y. 1989)....25

In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F.Supp. 712 (S.D.N.Y. 1989)....15

In re Johnson, No. 05-39238bf, 2008 WL 696917 (Bankr. E.D. Pa. Mar. 11, 2008)....11

In re MarketXT Holds. Corp., 347 B.R. 156 (Bankr. S.D.N.Y. 2006).... passim

In re Marlar, 432 F.3d 813 (8th Cir. 2005)....18

In re Mason, 20 B.R. 650 (9th Cir. B.A.P. 1982) ....................18

In re McCloy, 296 F.3d 370 (5th Cir. 2002) ....................18, 22

In re PPI Enters. (U.S.), Inc., 324 F.3d 197 (3d Cir. 2003) ....................26

In re QDN, LLC, 363 F. App'x. 873 (3d Cir. 2010) ....................19

In re Rubin, 769 F.2d 611 (9th Cir. 1985) ....................18

In re Shapiro, 128 B.R. 328 (Bankr. E.D.N.Y. 1991) ....................18

In re Sundown Assocs., 150 B.R. 156 (Bankr. E.D. Va. 1992) ....................25

In re Taylor & Assocs., L.P., 191 B.R. 374 (Bankr. E.D. Tenn. 1996) ....................21

In re Trusted Net Media Holdings, LLC, 550 F.3d 1035 (11th Cir. 2008) ....................18, 19

In re W&L Assoc's, Inc., No. 86-04999S 1988 WL 47598 (Bankr. E.D. Pa. May 10, 1988) ....................27

In re Walden Ridge Dev., LLC, 292 B.R. 58 (Bankr. D.N.J. 2003) ....................10

In re Zais Inv. Grade Ltd. VII, __ B.R. __, 2011 WL 3795169 (Bankr. D.N.J. Aug. 26, 2011) ....................1

In re Zarnel, 619 F.3d 156 (2d Cir. 2010) ....................17

Johnson v. Home State Bank, 501 U.S. 78 (1991) ....................24

Lamie v. United States Trustee, 540 U.S. 526 (2004) ....................21, 23, 26

Marsch v. Marsch (In re Marsch), 36 F.3d 825 (9th Cir. 1994) ....................11

NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108 (3d Cir. 2004) ....................10, 26

Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.), 200 F.3d 154 (3d Cir. 1999) ....................10, 11

Shell Petroleum, Inc. v. United States, 182 F.3d 212 (3d. Cir. 1999) ....................23

United Marine, L.L.C. v. Just for Windows, Inc. 2002 WL 72933 (S.D.N.Y. January 17, 2002) ....................18, 19, 21

United States v. Ron Pair Enters., Inc., 489 U.S. 235 (1989) ....................23

## STATUTES AND RULES

11 U.S.C. § 102 ....................24

11 U.S.C. § 109 .......... 9, 12

11 U.S.C. § 303 .......... passim

11 U.S.C. § 305 .......... passim

11 U.S.C. § 365 .......... 27

11 U.S.C. § 502 .......... 24

11 U.S.C. § 510 .......... 23,28

11 U.S.C. § 1111 .......... passim

11 U.S.C. § 1112 .......... passim

11 U.S.C. § 1123 .......... 27

11 U.S.C. § 1129 .......... passim

28 U.S.C. § 1344 .......... 18

**MISCELLANEOUS**

Federal Rule of Civil Procedure 59 .......... 17

*Involuntary Reflux?*, 75 Brook. L. Rev. 865 (2010) .......... 19

COLLIER ON BANKRUPTCY Section 1111 .......... 26

On April 1, 2011, GRF Master Fund, L.P., Anchorage Illiquid Opportunities Master Offshore, L.P., and Anchorage Capital Group, L.L.C. (collectively, the "Petitioning Creditors") filed an involuntary petition under chapter 11 of the Bankruptcy Code against Zais Investment Grade Limited VII (the "Debtor" or "ZIGL"). The Bankruptcy Court entered an order for relief (the "Order for Relief") on April 26, 2011. On May 23, 2011, Hildene Capital Management and Hildene Opportunities Master Fund, Ltd. (together, "Hildene") filed a motion (the "Motion to Dismiss" or the "Motion") requesting, among other things, that the Bankruptcy Court dismiss the Debtor's bankruptcy case pursuant to sections 305 and 1112 of title 11 of the United States Code (the "Bankruptcy Code"). On August 26, 2011, the Bankruptcy Court entered an order (the "Appealed Order") denying the Motion in its entirety. The decision supporting the Appealed Order (the "Opinion") is reported in In re Zais Inv. Grade Ltd. VII, __ B.R. __, 2011 WL 3795169 (Bankr. D.N.J. Aug. 26, 2011). Hildene now appeals the Appealed Order. Babson Capital Management LLC ("Babson") has filed a joinder to Hildene's appellate brief, and the Association of Financial Guaranty Insurers ("AFGI") has sought leave to file an *amicus* brief in support of the appeal.[1] The Petitioning Creditors hereby respond as follows:

## STATEMENT OF THE CASE

This bankruptcy case involves a vagary in the finance world known as a "zombie CDO." The Debtor here, Zais Investment Grade Limited VII, is a Cayman Islands limited liability company engaged solely in the business of owning various commercial and consumer debt obligations. In 2005, the Debtor issued more than $365 million of tiered notes secured by its assets. Due to the incredibly destabilizing market events of 2008 and thereafter, the value of the Debtor's assets plummeted, leaving even the Debtor's most senior noteholders severely

[1] While the Petitioning Creditors address limited issues raised in the *amicus* brief herein, the Petitioning Creditors reserve their right to object to AFGI's request for leave to file the brief.

undersecured. The fact that there is presently no value to distribute below the senior most tranches in the CDO has led to the collapse of the Debtor's investment management function, which not only lacks the incentive to maximize asset values but also is prohibited by the relevant indenture from actively managing the Debtor's assets under present circumstances. All the while, the assets that form the basis of the CDO structure are exposed to material market movements to the ultimate detriment of those few noteholders which have any economic interest in the structure.

This bankruptcy case provides a solution to the "zombie" problem, by using the bankruptcy process to reinstate management functions that are critical to maximizing the value of the Debtor's estate. As found below (and not challenged here), in moving towards that goal of maximizing value, the Debtor indisputably belongs before the Bankruptcy Court. It has assets and operations in the United States. Its massive debts have been and are currently in dire need of restructuring. Most importantly, it is eligible to be, and in the near future may in fact be, revitalized pursuant to a chapter 11 plan of reorganization. If that reorganization plan succeeds and the Debtor's management function is reinstated, the total value of the Debtor's assets may increase by more than $35 million.

Rather than applaud the creation of material value for creditors such as themselves, the Appellants (and the proposed *amicus* party) actually seek to have the Debtor returned to its zombie state. Why? In many respects, this dispute is not about actual losses, but rather the recognition of losses on investments in this CDO and, perhaps more pointedly, other unrelated CDOs. To explain, there is no dispute that Noteholders will suffer losses here – Hildene's own expert has opined that, even if the case were dismissed, Hildene's Junior A-2 Notes will not be paid in full. Couched in arguments of credit market expectations and lofty policy goals, the

Appellants contend that, though inevitable, their losses should not have to be recognized now. Rather, they argue, the losses should be incurred out of court and over a far more extended period of time "in accordance with the indenture."

As set forth below, each of the legal arguments advanced as to why there should be a deferral of reckoning and a return to "indenture zombiedom" are meritless. The Appellees filed a proper involuntary petition for relief under chapter 11. The Debtor, after consulting with competent counsel, acted properly and in accordance with its fiduciary duties in not contesting that petition. Notably, there is, as the Bankruptcy Court found, substantial value to be created by allowing the bankruptcy process to proceed. And, the terms of the indenture at issue which restricted active management of the Debtor's assets can be superseded by the Bankruptcy Code's provisions on plans of reorganization, as is the case in every bankruptcy involving debt instruments and indentures. In short, the Bankruptcy Court properly denied the motion to dismiss and should not be accused of abusing its discretion in doing so. The mere fact that the Appellants do not want to recognize the total or near total loss on their Notes (or explain to their investors the shortcomings of their investment thesis) is not a sufficient ground for interfering with a proper restructuring. Similarly, the mere fact that the proposed amicus party – representing the "interests" of insurers of CDOs in other, unrelated structures – does not want its constituents to have to pay on credit default swaps and insurance policies is not a basis for dismissing this case. On the contrary, the social goals of replacement of broken structures, maximization of value, reorganization of liabilities and restructuring of businesses is exactly what the U.S. Constitution envisions in Article I and what chapter 11 delivers. That process should be allowed to work here, and this Court should affirm the order below.

## STATEMENT OF FACTS[2]

### A. The Indenture and the Notes

On October 19, 2005, the Debtor entered into an indenture (the "Indenture") with JPMorgan Chase Bank, National Association, as trustee (together with its permitted successors in the trusts under the Indenture, the "Trustee"). The Bank of New York Mellon Trust Company, N.A. is the successor to JPMC as the Trustee under the Indenture.[3] B. Ct. Dckt. 100 at p. 1.

The Indenture provides for, among other things, the authentication and delivery of the promissory notes (the "Notes") in an aggregate principal amount of $365,500,000. B. Ct. Dckt. 122, Ex. G. The Notes are segregated into eight tranches. Given asset value ranges presented to the Court below, only two tranches of notes are even potentially "in the money": (i) $184,113,051 in Class A-1A senior secured floating rate notes and Class A-1B senior secured fixed rate notes (the "Senior Notes") and (ii) $27,000,000 in subordinated Class A-2 senior secured floating rate notes (the "Junior A-2 Notes"). The Senior Notes, a majority of which are owned by the Petitioning Creditors, mature in 2040, and the Junior Notes owned by Hildene mature in 2046. B. Ct. Dckt. 105 at ¶ 2. As part of the CDO structure, the Debtor pledged all of

---

[2] The Bankruptcy Court's findings of facts are incorporated herein by reference and supplemented as set forth below.

[3] In connection with the Motion below, the parties submitted the following evidence: B. Ct. Dckt. 41, Declaration of Jane Sullivan (hereinafter, "Sullivan Declaration"); B. Ct. Dckt. 46, Hildene's Motion to Dismiss; B. Ct. Dckt. 47, Declaration of Eric D. Winston; B. Ct. Dckt. 100, Affidavit of Shelly S. Torkelson; B. Ct. Dckt. 105, Petitioning Creditors' Objection to Motion to Dismiss; B. Ct. Dckt. 105-1, Declaration of Yale Baron (hereinafter, "Baron Declaration"); B. Ct. Dckt. 107, ZAIS Group, LLC Joinder to Motion to Dismiss; B. Ct. Dckt. 116, Hildene's Response to Objection to Motion to Dismiss; B. Ct. Dckt. 116-1, Declaration of Scott Shelley; B. Ct. Dckt. 116-2, Declaration of Brett Jefferson; B. Ct. Dckt. 117, Supplemental Affidavit of Shelly S. Torkelson; B. Ct. Dckt. 118, Joinder of Babson to Motion to Dismiss; B. Ct. Dckt. 122, Declaration of Dwight A. Healy; B. Ct. Dckt. 123, Statement of the Debtor in Response to Motion to Dismiss; B. Ct. Dckt. 129, Second Supplemental Declaration of Dwight A. Healy; B. Ct. Dckt. 140, Motion of Hildene for Leave to File a Post-Trial Brief; B. Ct. Dckt. 141, Response by Anchorage to Motion of Hildene for Leave to File a Post-Trial Brief. Citation to the record will be to the docket number of the relevant pleading or transcript and, where necessary, to the exhibits to those pleadings.

its material assets, including its collateral securities, to the Trustee as security for the Senior Notes and Junior Notes.[4] B. Ct. Dckt. 100.

### B. The Debtor's Need for Restructuring

Throughout 2007 and 2008, the condition of the U.S. mortgage market continued to deteriorate and expanded to the broader U.S. credit markets. This decline caused the value of mortgage-backed securities and other collateralized securities to decrease significantly. As a result of deteriorating markets and the inaccuracy of the assumptions underlying the mathematical model used to structure and rate the Debtor's Notes, the Debtor's assets are extremely distressed and the Notes severely under-collateralized. Baron Declaration at ¶ 4. Specifically, the Debtor owes Noteholders approximately $320 million in principal amount of claims on their Notes, B. Ct. Dckt. 133 at p. 7, while the Trustee concluded that as of April 8, 2011, the Debtor's cash and collateral securities were only worth approximately $165.8 million. B. Ct. Dckt. 133 Ex. B.

The Notes were declared in default by the Trustee on March 11, 2009, and were accelerated and deemed due and payable over two years ago, on June 3, 2009. Prior to default, the tasks necessary for the Debtor to carry out its business were conducted by Zais Group, LLC (the Debtor's collateral manager), The Bank of New York Mellon Trust Company, N.A. (the Debtor's collateral administrator and the Trustee), and Maples Finance Limited (the Debtor's Cayman Islands administrator). Upon default, the Debtor's collateral manager stopped managing the assets, as the Indenture does not permit active management or sale of assets upon the occurrence and continuation of an event of default (although Zais Group, LLC continues to earn a management fee). See Baron Declaration, Exhibit B, Indenture at § 12.1. Without active

---

[4] Appellants contended below that the Debtor did not, in fact, own the assets against which the Notes were secured. The Bankruptcy Court found otherwise, and the Appellants have not appealed that ruling.

management in place to prevent further erosion in asset values, the collateral underlying the Notes depreciated significantly, causing the Debtor to have to write off a disturbing number of assets. B. Ct. Dckt. 39-3. Moreover, most of the Debtor's remaining assets are exposed to mortgage risk, primarily in the form of residential mortgage-backed and home-equity loan securities. A majority of such assets are not performing, and more defaults are expected in the future. The Debtor's remaining assets are largely exposed to corporate credit risk, including corporate and commercial bank loans, assets backed by high-yield bonds, emerging market bonds, trust preferred securities and investment grade bonds, which are similarly subject to global credit market conditions and risk of future defaults. Baron Declaration at ¶ 4. If action is not taken to appropriately manage the situation, further erosion of value should be expected. See Baron Declaration at ¶ 5. Given that the Debtor's very nature is that of a non-operating investment vehicle mired in an unmanaged, long-term liquidation, a present restructuring of the Debtor has become critical.

**C. The Petitioning Creditors**

The Petitioning Creditors are three separate private investment funds that collectively hold approximately $117,437,710 aggregate principal amount outstanding of Senior Notes and $8,269,354 aggregate principal amount outstanding of Junior Notes. Each Petitioning Creditor purchased the majority of its Senior Notes more than a year before the filing of the involuntary petition and approximately nine months prior to meeting with the Debtor's board of directors in November, 2010. The Petitioning Creditors are managed by Anchorage Capital Group, L.L.C. ("ACG"), an experienced structured-product investment manager. Baron Declaration at ¶ 3.

**D. Events Leading to the Commencement of the Case**

In November of 2010, the Petitioning Creditors met with the Debtor's board of directors concerning the need to restructure the Debtor. The Petitioning Creditors stressed to the board

their concerns as to the dissipation of the Debtor's limited assets and the need for a structured liquidation. The Petitioning Creditors suggested that the board of directors issue a consent solicitation and, if sufficient consents were not received from all tranches of notes to unwind pursuant to section 5.5 of the Indenture but were received to constitute an accepting class in a chapter 11 bankruptcy case, the Debtor file a chapter 11 prepackaged plan. Baron Declaration at ¶ 5.

After consulting with counsel (including U.S. bankruptcy counsel), the Debtor's board of directors informed the Petitioning Creditors that the board would not file a voluntary bankruptcy petition for the Debtor, but acknowledged that the Indenture did not prohibit the Petitioning Creditors from filing an involuntary petition. Further, the board advised that, subject to a continuing review of fiduciary duties, the Debtor would not oppose efforts of the Petitioning Creditors to restructure the Debtor under chapter 11. Baron Declaration at ¶ 5.

Thereafter, the Petitioning Creditors commenced solicitation of a proposed prepackaged plan pursuant to applicable non-bankruptcy law. Of the Senior Noteholders that returned a ballot, the plan was accepted by holders owning 95% of the principal amount of such Senior Notes. Additionally, the plan was accepted by 66.6% in number of those Senior Noteholders that returned a ballot. Sullivan Declaration, Ex. 5. The plan adheres to the contractual and subordination waterfall provisions contained in the Indenture and pays all claims senior to the Senior Notes in cash in full. B. Ct. Dkt. 39 (hereinafter, the "Disclosure Statement") at p. 8; see also B. Ct. Dkt. 38 (hereinafter, the "Plan") at Art. III – IV; Baron Declaration, Exhibit B, Indenture at § 11.1. The plan also provides that ACG, whose employees have significant experience with structured assets such as those owned by the Debtor, will act as investment manager for the reorganized Debtor, overseeing the opportunistic and organized liquidation of

the Debtor's assets. See Disclosure Statement at p. 22; Baron Declaration at ¶ 3. Moreover, the Debtor's estate will forgo potentially significant costs, as ACG will not charge the Debtor's estate a fee for its services as investment manager. See Disclosure Statement at p. 22.

**E. The Appellants**

On April 1, 2010, after solicitation of the Plan was completed, the Petitioning Creditors filed an involuntary petition (the "Petition") under chapter 11 of the Bankruptcy Code against the Debtor. In the Petition, the Petitioning Creditors alleged that they met each of the requirements of section 303 of the Bankruptcy Code. B. Ct. Dckt. 1. The Debtor first appeared in the bankruptcy case through counsel at a status conference on April 8, 2011. On April 19, 2011 and April 21, 2011 – almost three weeks after the filing of the Petition and with knowledge of its filing – Hildene purchased its Junior Notes. Brett Jefferson, the President and Chief Investment Officer of Hildene, testified at his deposition that Hildene reviewed the Indenture and the proposed plan before purchasing its Notes.[5] At the time of its April 19, 2011 purchase, Mr. Jefferson informed the seller counterparty that Hildene was contemplating objecting to the bankruptcy. Jefferson Tr. 116:20-25. Hildene purchased the rest of the Junior A-2 Notes on April 21, 2011, because "at that point we were going to be opposed to this [bankruptcy]." Jefferson Tr. 128:3-18. According to Mr. Jefferson, Hildene believes that a senior creditor initiating a bankruptcy case against a CDO would set a bad precedent for the junior credit notes Hildene holds in other similar vehicles. Jefferson Tr. 108:17-109:9.

Neither the Debtor nor Hildene opposed the Petition, and on April 26, 2011, the Bankruptcy Court entered the Order for Relief.

---

[5] B. Ct. Dkt. 122, Ex. A, Transcript of the July 11, 2011 deposition of Brett R. Jefferson ("Jefferson Tr.") at 59:14-60:24, 74:10-24, 83:7-85:2, 117:10-13 & 133:3-13.

**F. The Dismissal Motion and Order**

On May 23, 2011, one month after the Order for Relief was entered, Hildene filed its Motion to Dismiss. In it, Hildene requested that the bankruptcy case be dismissed because (1) ZIGL is not an eligible debtor under section 109 of the Bankruptcy Code, (2) the Petitioning Creditors did not qualify as creditors permitted to file an involuntary bankruptcy case under section 303(b) of the Bankruptcy Code, and (3) there was otherwise "cause" to dismiss the case under section 1112(b) of the Bankruptcy Code. Hildene also requested that the Bankruptcy Court abstain from the case pursuant to section 305 of the Bankruptcy Code. B. Ct. Dckt. 46. Babson, a holder of a small amount of Senior Notes represented by the same counsel that represents Hildene and whose legal fees are being paid by Hildene, joined in the Motion on the eve of the hearing on the Motion to Dismiss, thus precluding any opportunity for the Appellees to take discovery into their motives. B. Ct. Dckt. 118.

A hearing on the Motion to Dismiss was held on July 29, 2011, and the Court heard oral argument encompassed in 119 pages of transcript. B. Ct. Dckt. 135. On August 26, 2011, the Bankruptcy Court entered the Appealed Order and filed the Opinion. In the Opinion, the Bankruptcy Court rejected all of Hildene's arguments, noting in summation that

> [b]ecause the Debtor failed to contest the involuntary petition and the order for relief has been entered, Hildene may not challenge the involuntary petition. The Debtor has property in the United States and a place of business in the United States through a trustee and the Collateral Manager; therefore, it is eligible to be a debtor under title 11, United States Code. The petitioning creditors have established a good faith basis for filing this involuntary petition in that they seek to maximize the value of the Debtor's assets by actively managing them freed of the strictures of the trust indenture.

Opinion at p. 2.

On August 31, 2011, Hildene filed its notice of appeal. B. Ct. Dckt. 149. In pursuing its appeal, Hildene has abandoned all of the legal and factual arguments that it raised in the Motion

except for the argument that the bankruptcy case should have been dismissed for "cause" pursuant to section 1112(b) of the Bankruptcy Code.

## STANDARD OF REVIEW

In light of all the foregoing, the sole issue for this Court on this appeal is whether the Bankruptcy Court erred by denying the Motion to Dismiss the Debtor's bankruptcy case for "cause". That error should be considered pursuant to an abuse of discretion standard. See NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108, 118 (3d Cir. 2004); Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.), 200 F.3d 154, 159 (3d Cir. 1999). An abuse of discretion exists where a decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." ACLU v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1476 (3d Cir. 1996).

On a motion to dismiss for cause, a bankruptcy court may generally consider if the bankruptcy petition was filed in "bad faith." See In re SGL Carbon Corp., 200 F.3d at 159-63; In re Brown, 951 F.2d at 572. The movant has the initial burden of presenting a *prima facie* case of bad faith, and, if the movant presents such a case, the burden shifts to the petitioner to prove that the filing was in good faith. See In re Walden Ridge Dev., LLC, 292 B.R. 58, 62 (Bankr. D.N.J. 2003); Cont'l Ill. Nat'l Bank & Trust Co. of Chicago v. Century City, Inc. (In re Century City, Inc.), 8 B.R. 25, 31 (Bankr. D.N.J. 1980).

Whether a particular bankruptcy case was filed in bad faith requires a "fact intensive inquiry" in which the bankruptcy court must examine "the totality of facts and circumstances" and determine where the "petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." In re SGL Carbon Corp., 200 F.3d at 162. A bankruptcy petition may fall on the abusive side of the spectrum, and may be found to have been filed in bad faith, if filed to

"achieve objectives outside the legitimate scope of the bankruptcy laws." Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994). However, a bankruptcy case is filed to achieve a legitimate bankruptcy purpose by, for example, preserving a going concern or maximizing the value of the debtor's estate. In re Crown Vill. Farm, LLC, 415 B.R. 86, 92 (Bankr D. Del. 2009) ("[C]ourts in this Circuit have made clear that even where the debtors are not attempting to preserve a going concern, for example when a liquidation plan is filed, they can still satisfy the good faith requirement, provided that the filing preserves 'some value that otherwise would be lost outside of bankruptcy.'") (citing In re 15375 Memorial Corp., 400 B.R. 420, 427 (D. Del. 2009)). Courts have also acknowledged that a bankruptcy case may be filed in bad faith if it is intended solely to provide the petitioner with a "tactical litigation advantage." In re SGL Carbon Corp., 200 F.3d at 165.

Finally, in determining whether the totality of circumstances demonstrates bad faith, a bankruptcy court may exercise its discretion in deciding which factors it wishes to consider in assessing cause. See Colonial Daytona Ltd. P'ship v. Am. Savs. of Fla., 152 B.R. 996, 1001 (M.D. Fla. 1993) ("Thus, the court is given judicial discretion to determine what factors shall constitute 'cause' under the circumstances of each case."); In re Johnson, No. 05-39238bf, 2008 WL 696917, at *6 (Bankr. E.D. Pa. Mar. 11, 2008) ("Factors other than those expressly enumerated in the statute may be considered, and the Court has the discretion to reach the appropriate result in a particular case.").

## ARGUMENT

### I – THE BANKRUPTCY COURT PROPERLY FOUND THAT THIS BANKRUPTCY CASE WAS COMMENCED IN GOOD FAITH

As noted above, the central issue in this appeal is whether the Debtor ought to be restructured pursuant to a plan of reorganization subject to federal judicial oversight or instead

returned to its zombie state to operate without active management for as long as thirty more years. In addressing that issue, the Bankruptcy Court concluded that the Debtor has defaulted on approximately $320 million of notes, that the Debtor owns assets in the United States, that it is an eligible debtor under section 109 of the Bankruptcy Code, that its business is in distress, and that the value of its assets could be maximized by actively managing the collateral underlying those securities to prevent further loss. Opinion at p. 4. These conclusions are premised upon legal conclusions and findings of fact that Appellants do not challenge here.

Instead, Hildene has only appealed the Court's decision to deny dismissal under section 1112(b) of the Bankruptcy Code – essentially taking the position that an otherwise proper involuntary bankruptcy case should be dismissed if there was demonstrable "bad faith" on the part of a petitioning creditor. The Bankruptcy Court, however, made specific factual findings that there was no evidence of the Petitioning Creditors having filed the involuntary petition in bad faith. Id. at 15. Instead, the Bankruptcy Court found that the filing was designed to benefit all of the Senior Noteholders and to maximize the Debtor's overall estate. Id. at 14. Alluding to the burden-shifting nature of section 1112(b) of the Bankruptcy Code, the Bankruptcy Court further explained that, even if Hildene had presented a case of objective bad faith,

> the court finds that the petitioning creditors have shown good faith in their desire to realize the greatest present value of the Collateral Securities for the benefit of the Class A-1 creditors without negatively impacting junior creditors who have no prospect of recovery under the status quo. It remains to be seen if the plan proponents can carry their burden of proof at confirmation.

Id. at 15. These findings were not clearly erroneous, and, in any event, Hildene's appellate brief raises no specific objection to the legitimacy of the good faith finding.

Indeed, each of these findings are well-supported by the record submitted to the Court below. Mr. Yale Baron, a Structured Credit Analyst at ACG who has been the principal manager of the Petitioning Creditors' investments in the Debtor, submitted a declaration to the Court and

sat for a lengthy deposition. B. Ct. Dckt. 105-1; B. Ct. Dckt. 122, Ex. B. At his deposition, Mr. Baron testified that the Petitioning Creditors purchased Notes solely for investment purposes and, only after each Petitioning Creditor's initial purchases did they start considering liquidating the Debtor via a consent solicitation or bankruptcy. B. Ct. Dckt. 122, Ex. B at p. 85 & 137-9. Mr. Baron further testified that "restructuring would maximize recoveries to the Debtor's creditors." Baron Declaration at ¶ 5. Despite extensive document production (more than 3,000 documents) and a deposition, the Appellants failed to introduce any evidence to the Court to support their accusation that the Petitioning Creditors acted in subjective bad faith in filing the Petition. The Court below was also presented with an expert report from Houlihan, Lokey, Howard & Zukin Capital, Inc., a well-regarded valuation firm, which supports the Petitioning Creditors' thesis. That report concludes that ACG's management will be able to enhance the value of the Debtor's assets by at least $35 million on a discounted cash flow basis above what could be expected outside bankruptcy. B. Ct. Dckt. 39-3. Further, notwithstanding the significant contribution that ACG will be making to the Debtor's estate, ACG has agreed to forego charging the estate for its services, thereby providing all other in-the-money creditors a disproportionate share of the accretion in value resulting from confirmation of a plan. See Disclosure Statement at p. 22. In short, there is no legitimate basis upon which to challenge the Court's finding of good faith on the part of Petitioning Creditors.

## II – THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION BY DENYING THE MOTION TO DISMISS THIS CASE FOR "CAUSE"

In their briefing, the Appellants and proposed *amicus* party set forth several purported reasons why the Bankruptcy Court should have dismissed a proper chapter 11 bankruptcy case commenced in subjective good faith. None of these justifications, even if true, rise to the level of

"cause" supporting a dismissal order, much less support the conclusion that the Bankruptcy Court abused its discretion in refusing to enter such an order.

Before addressing each of the Appellants' proffered legal justifications for dismissal, however, there is one undercurrent to the briefs filed by, or in support of, the Appellants that should be exposed. Throughout the papers, and indeed the principal thrust of the proposed *amicus* brief, is an expression of "surprise" that a CDO is currently a chapter 11 debtor. See, e.g., Hildene Brief at p. 1 ("This is an appeal from a landmark ruling of the Bankruptcy Court of this District – it represents the first time a creditor successfully placed a collateralized debt obligation vehicle ('CDO') into an involuntary bankruptcy in the United States. Such a result is remarkable because CDOs were designed to be financing vehicles that are bankruptcy remote . . ."); AFGI Brief at p. 4 (recommending reversal because "the Bankruptcy Court failed to appreciate that a CDO is not a typical debtor in bankruptcy" and "was specifically designed to be bankruptcy remote"). These sentiments are misplaced.

First, any purported surprise here is directly counter to the express terms of the Indenture, which clearly contemplates that the Senior Noteholders could file an involuntary case against the Debtor. Section 13.1 of the Indenture specifically speaks to the issue of whether noteholders may file involuntary bankruptcy proceedings, and specifically prohibits junior noteholders from doing so unless and until more senior classes ("Priority Classes") have been fully paid.[6] As clearly set forth in Section 2.3 of the Indenture, the notes that the Petitioning Creditors hold are the most senior class and have no "Priority Class." Those Senior Notes, then, are free from any restraint on filing. Moreover, there can be no dispute that the possibility of an involuntary

---

6 Section 13.1 provides in relevant part: "The Holders of each Junior Class agree, for the benefit of the Holders of the Notes of each Priority Class in respect of such Junior Class, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due to such Junior Class or hereunder until the payment in full of such Priority Class and not before one year and one day, or if longer, the applicable preference period then in effect, has elapsed since such payment." Baron Declaration, Exhibit B, Indenture at § 13.1(a).

bankruptcy case against the Debtor was a known risk to all holders of Notes issued under the Indenture, including each of the Appellants here. For instance, "Bankruptcy Law" is a specific defined term under the Indenture (and includes both U.S. and Cayman bankruptcy laws). Section 5.3 of the Indenture, which governs collection efforts of the indenture trustee on the Notes, permits the Trustee to intervene in "Proceedings relative to the Issuer . . . under the Bankruptcy Law or any other applicable bankruptcy, insolvency or other similar law." B. Ct. Dckt. 122, Ex. G (emphasis added). That section also permits the Trustee to file proofs of claim, to vote on plans and to collect and receive bankruptcy distributions in such Proceedings. Id. Section 5.4(d) of the Indenture prohibits the Trustee from filing a Proceeding "prior to the date which is one year and one day (or, if longer, any applicable preference period) after the payment in full of all Senior Notes," but otherwise does not restrict the Trustee from filing a bankruptcy case against the Issuer. Id. That section also expressly permits the Trustee to take all necessary actions in "any involuntary Proceeding filed or commenced by a Person other than the Trustee." Id. (emphasis added).

Second, the Indenture is a New York law-governed document. Under New York law, the express language of a contract trumps any alleged subjective intent of the parties as to the meaning thereof. See In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F.Supp. 712, 728 (S.D.N.Y. 1989) ("It is a fundamental principle of contract interpretation that, absent ambiguity, the intent of the parties must be determined from their final writing.") (citing Int'l Klafter Co. v. Cont'l Cas. Co., 869 F.2d 96, 100 (2d Cir. 1989)). Thus, whether or not Noteholders such as the Appellants believed the bankruptcy was possible is irrelevant to what the documents and law actually provide. In any event, Appellees are unaware of any bankruptcy decision that has ever held that the issue of whether a bankruptcy case should proceed can be dictated by whether a

particular creditor (or in the case of the proposed *amicus*, a non-creditor market participant) expected that a bankruptcy filing would occur.

If one focuses on the merits of this case, the Appellants' pared-down argument for dismissal is simply this: because the Petitioning Creditors allegedly were not eligible to file or were contractually prohibited from filing the Petition, the Bankruptcy Court was, as a matter of law, required to find "cause" to dismiss the case. B. Ct. Dckt. 4 (hereinafter the "Hildene Brief") at pp. 19-20. That argument fails for four independent reasons.

### A. The Qualifications of a Petitioning Creditor to Commence an Involuntary Case Are Not a Proper Basis for Dismissal After Entry of an Order for Relief

One fundamental problem with the Appellants' present focus on the *bona fides* of the Petition is that they completely ignore the effect of the Order for Relief. The issue of whether the Petitioning Creditors were eligible or permitted to file under section 303 of the Bankruptcy Code (and, as set forth in section II, B, 4 below, they clearly were) was framed by the Petition itself. In the Petition, the Petitioning Creditors alleged that (a) they were three or more creditors of the Debtor holding claims in excess of the statutory minimum and (b) that the Debtor was not generally paying its debts as they became due. B. Ct. Dckt. 1. The Debtor, actively represented by competent counsel, was served with that pleading and determined in its business judgment not to contest the allegations against it. Any disputes, then, as to the veracity of the allegations in the Petition were fully and finally resolved when the Bankruptcy Court entered the Order for Relief, as to which no appeal was filed.

The Appellants' present attack on the Petitioning Creditors' qualifications is simply an impermissible collateral attack on the Order for Relief. Indeed, courts have universally recognized – and thus essentially established a bright-line rule – that a petitioning creditor's qualifications are only relevant and reviewable prior to entry of an order for relief.

To explain, in order to litigate issues resolved by a prior court order, a party must either seek to reopen the order pursuant to Federal Rule of Civil Procedure 59 or 60 (which was not done here) or establish that the order was beyond the Court's subject matter jurisdiction. In several key cases, involuntary debtors and their creditors have sought to challenge orders for relief on this latter ground – contending in essence that a defect in a petition required later dismissal of the case. Relying upon the Supreme Court's decision in Arbaugh v. Y & H Corp., 546 U.S. 500, 503 (2006),[7] the Second Circuit, in a case directly on point, held that the requirements of section 303 of the Bankruptcy Code were not jurisdictional in nature and abrogated an earlier decision that found to the contrary and allowed a collateral attack on an order for relief against a debtor. In re Zarnel, 619 F.3d 156, 168-69 (2d Cir. 2010) (finding the holding in In re BDC 56 LLC, 330 F.3d 111 (2d Cir. 2003) to no longer be good law). In reaching this conclusion, the Second Circuit explained that section 303 of the Bankruptcy Code "contains no explicit reference to its requirements being jurisdictional in nature and never uses the word 'jurisdiction.'" Id. at 169 (quoting In re Trusted Net Media Holdings, LLC, 550 F.3d 1035, 1043 (11th Cir. 2008)). In addition, the text of the statute does not "suggest that the bankruptcy court should *sua sponte* raise the issue of whether the requirements of § 303 are satisfied; in fact, § 303(h) provides the opposite, since the bankruptcy court should order relief if the petition is not timely controverted." Id. at 168.[8] "Moreover, the Bankruptcy Code is governed by a separate jurisdictional provision, 28 U.S.C. § 1344, which contains other

---

[7] In Arbaugh, the Supreme Court established a "readily administrable bright line" test for determining whether a statute is subject matter jurisdictional in nature. 546 U.S. at 503. The Court found that "[i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." Id. at 515-16 (internal citations omitted).

[8] Section 303(h) of the Bankruptcy Code provides, "If the petition is not timely controverted, the court ***shall*** order relief against the debtor in an involuntary case under the chapter under which the petition was filed." 11 U.S.C. § 303(h) (emphasis added).

restrictions and exclusions." Id. As a result, the Second Circuit held that "the restrictions of § 303 fall decisively on the nonjurisdictional side of Arbaugh's bright line." Id. at 169.

In addition to the Second Circuit, at least eleven other courts have reached similar conclusions and held that the requirements of section 303 are not jurisdictional and may not be raised by either a debtor or a creditor after entry of the order for relief.[9] This universal condemnation of attempts to revisit section 303 after entry of an order for relief has led one commentator to note that Arbaugh "provides the proverbial nail in the coffin" regarding the issue of whether section 303's requirements are jurisdictional. Rachel Green, *Treating Section 303(b) of the Bankruptcy Code as Subject Matter Jurisdictional, Sound Approach or Involuntary Reflux?*, 75 Brook. L. Rev. 865 (2010). In short, all of these cases stand for the proposition that an otherwise valid involuntary bankruptcy case is not subject to dismissal after the order for relief merely because of perceived "jurisdictional" deficiencies in the petition.

---

[9] See In re Trusted Net Media Holdings, LLC, 550 F.3d at 1043 (refusing to dismiss case because requirements of section 303(b) are nonjurisdictional in nature and were waived by debtor); In re Mason, 20 B.R. 650, 651 (9th Cir. B.A.P. 1982) ("Defects in the creditors' petition do not deprive the Bankruptcy Court of subject matter jurisdiction and were waived by the debtor Mason when he failed to answer."); In re MarketXT Holds. Corp., 347 B.R. 156, 160-61 (Bankr. S.D.N.Y. 2006) (refusing to dismiss case and finding that section 303(b)'s requirements are not jurisdictional in nature and finding that any ruling to the contrary would nullify sections 303(d) and 303(h)); United Marine, L.L.C. v. Just for Windows, Inc., 2002 WL 72933, *3 (S.D.N.Y. January 17, 2002) (holding that section 303(b)'s requirement that petitioning creditors have unsecured claims greater than statutory amount was not jurisdictional in nature and were affirmative defenses that were waived by debtor pursuant to section 303(h) upon its failure to contest the involuntary petition.); In re Barth, 109 B.R. 570, 574 (Bankr. D. Conn. 1990) ("The number of petitioning creditors is unrelated to the issue of the court's subject matter jurisdiction, and a lack of the requisite number of petitioning creditors does not deprive the court of jurisdiction to enter an order for relief."); In re Marlar, 432 F.3d 813, 814-815 (8th Cir. 2005) (per curiam) (holding that that an alleged debtor must timely assert any affirmative defense it may have under section 303 or such issues will be waived pursuant to section 303(h)); In re McCloy, 296 F.3d 370, 375 (5th Cir. 2002) (holding that section 303(a) relating to farmers is an affirmative defense that can be waived and is mooted by order for relief); Commercial Credit Corp. v. Skutt, 341 F.2d 177, 181 (8th Cir. 1965) (failure of creditors' petition to allege insolvency did not preclude order for relief when not opposed by bankrupt); General Kontrolar Co. v. Allen, 124 F.2d 123, 127 (6th Cir. 1941) ("Unlike requirements of residence or domicile, a defect as regards the number of creditors may be waived."); In re Shapiro, 128 B.R. 328, 331 (Bankr. E.D.N.Y. 1991) (section 303 requirements are not jurisdictional); In re Rubin, 769 F.2d 611, 614-5, n. 3 (9th Cir. 1985) (section 303(b)'s "requirements are not jurisdictional in the technical sense of subject matter jurisdiction, but are instead substantive matters which must be proved or *waived* for petitioning creditors to prevail in involuntary proceedings").

**B. Hildene Lacks Standing to Contest the Petitioning Creditors' Qualifications to File a Petition against the Debtor**

Further, even if the Appellants were permitted to collaterally attack the now final Order for Relief, the issue of qualifications to file the Petition is one properly between the Petitioning Creditors and the Debtor. Section 303(d) allows only a debtor to contest an involuntary bankruptcy, because the "filing of an involuntary petition is an adversarial proceeding between the filers and the debtor." In re QDN, LLC, 363 F. App'x. 873, 876 (3d Cir. 2010). See 11 U.S.C. § 303(d). As a technical matter, then, a petitioning creditor's failure to satisfy a requirement of section 303(b) is an affirmative defense of the debtor to the filing of an involuntary bankruptcy case and is waived if not asserted before entry of the order for relief. See Trusted Net Media Holdings, 550 F.3d at 1043 (holding that section 303(b)'s requirements are not jurisdictional in nature and were affirmative defenses that were waived by debtor pursuant to section 303(h) upon its failure to contest the involuntary petition); see also United Marine, 2002 WL 72933, *3 (same). Accordingly, as the Third Circuit has stated "it is well-established that a *creditor*. . . does not have standing to contest an involuntary bankruptcy filing." In re QDN, LLC, 363 F. App'x at 875-76; see also In re MarketXT Holds., Corp., 347 B.R. 156, 160 (Bankr. S.D.N.Y. 2006) ("[T]he sufficiency of an involuntary petition may only be challenged by the debtor and not by creditors or third parties . . . ."). In short, the qualifications of a petitioning creditor are affirmative defenses that can be, and here have been, waived by the Debtor.

As its primary defense to its post-Order for Relief attack on the petition, Hildene relies upon MarketXT, which, in a footnote, Hildene claims "acknowledges that while a creditor lacks standing to contest an involuntary petition, a creditor can seek dismissal under sections 305 and 1112." Hildene Brief at p. 24 n. 15 (citing MarketXT, 347 B.R. at 160 n. 4). Yet, Hildene misstates MarketXT, a case in which a bankruptcy court denied a creditor's motion to dismiss

that was, like here, filed after entry of the order for chapter 11 relief and premised upon the petitioning creditor's lack of qualifications under section 303(b) of the Bankruptcy Code. In re MarketXT, 347 B.R. at 160-62. The MarketXT footnote cited by Hildene only states the undisputed truth that a creditor who lacked standing to object to the qualifications of a petitioning creditor can still move to dismiss for *other* reasons pursuant to sections 305 and 1112 of the Bankruptcy Code. Id. at 160 n. 4.[10]

Indeed, in cases where bankruptcy courts simultaneously considered objections to the propriety of an involuntary petition brought under section 303 and motions to dismiss under sections 305 or 1112 of the Bankruptcy Code, those courts declined to consider the qualifications of the petitioning creditors in their analyses of the motions to dismiss. See, e.g., In re Smith, 415 B.R. at 228, 239 (after finding that order for relief should be entered, notwithstanding arguments that the petitioning creditors were ineligible and that an insufficient number of creditors supported the petition, considering motion to dismiss or abstain and failing to consider the arguments raised under section 303(b) of the Bankruptcy Code); In re Barth, 109 B.R. at 573-75 (disregarding debtor's pleading filed after entry of order for relief alleging that one of the petitioning creditors was not eligible and denying motion to dismiss under 305 of the Bankruptcy Code without considering the petitioning creditor's qualifications); In re Taylor, 191 B.R. at 376 (denying a party in interest's motion to dismiss under section 305 of the Bankruptcy Code without considering, in analysis of that request, the movant's claim that an order for relief should not be entered because one of the petitioning creditors was ineligible).

---

[10] Tellingly, the MarketXT Court seems not to have accepted the idea that a petitioning creditor's lack of qualifications is a basis for granting a motion to dismiss under section 1112(b) of the Bankruptcy Code. In the same footnote cited by Hildene, the Court notes that the movant in that case had not satisfied the requirements for dismissal or abstention under either section 305 or 1112 of the Bankruptcy Code, notwithstanding all of the evidence introduced by the creditor as to the petitioning creditor's ineligibility. In re MarketXT Holds., Corp., 347 B.R. at 160 n.4.

## C. Policy Concerns Disfavor Hildene's and the Proposed Amicus's Positions

At its heart, then, the Appellants' (and AFGI's) attack on the Petition is premised on a belief that, as a matter of public policy, the Bankruptcy Court should not have sanctioned the filing of a defective petition that otherwise results in a proper bankruptcy case of a CDO. As an initial matter, the Bankruptcy Court can hardly be found to have abused its discretion in failing to make a policy-based ruling, particularly where the Supreme Court has indicated that a bankruptcy court should not look past the plain language of an unambiguous bankruptcy statute. See Lamie v. United States Trustee, 540 U.S. 526, 534 (2004). In any event, the Appellants' policy concerns are misplaced.

First, if this Court were to agree with Hildene's argument that filing qualifications are relevant to a motion to dismiss under section 1112(b) of the Bankruptcy Code, then the efficacy of all involuntary bankruptcies could be undermined as parties in interest could move to dismiss such cases at any time (even after the incurrence of substantial expense by the court, the debtor's estate and other parties in interest) based upon an issue that was resolved at the case's outset. Indeed, many of the courts that have refused to consider alleged deficiencies in an involuntary petition after entry of the order for relief have expressed these very concerns. See, e.g., United Marine, 2002 WL 72933, *3 (finding that a "rule that excuses debtors from the obligation to answer petitions that do not meet the 11 U.S.C. § 303(b) requirements and protects them from the automatic entry of relief would create a perverse incentive for debtors to sit on their hands, secure in the knowledge that the petition can later be overturned and that any voidable transfers made before the petitioner filed anew could not be invalidated by the second petition."); MarketTXT, 347 B.R. at 162 ("If [such] jurisdictional contentions were correct, and the strictures of § 303(h) were not given effect, petitioning creditors dissatisfied with the course of a case could reexamine the bona fides of their own claims and seek dismissal even if the

proceedings had been pending for years."); In re McCloy, 296 F.3d at 375 ("Allowing a debtor to claim [defects in an involuntary filing] at any point in a bankruptcy proceeding (as can be done with challenges to subject matter jurisdiction) would create 'unnecessary uncertainty' in the bankruptcy process. This circumstance could interfere with the bankruptcy court's ability to reorganize debtors by allowing this question to be raised at any time, in a possibly strategic manner.").

Second, the premise of the Appellants' policy arguments – that creditors will be incented to file improper cases against "letterbox companies" is entirely counterfactual to this case. As noted, supra, there was (and is) a Debtor represented by a board of directors owing fiduciary duties to its creditors. The Debtor and such directors were represented by competent bankruptcy counsel and had sufficient time to consider the Petition and the issues raised by its filing. And, given that the Debtor is in severe financial distress, there were valid, unchallenged business justifications for not opposing entry of the Order for Relief. Dire warnings of creditors taking improper advantage of absent CDO debtors are simply not applicable here.

**D. The Bankruptcy Petition Was, In Any Event, Properly Filed**

Even if, contrary to all existing law, the Appellants were permitted to contest the Petitioning Creditors' qualifications on a motion to dismiss, there is no basis for any such contest. Essentially, the Appellants claim three "defects" in the Petition: (1) the Petitioning Creditors were not qualified to act as petitioning creditors; (2) the Petitioning Creditors breached the Indenture by filing the Petition; and (3) the Petition violates section 510 of the Bankruptcy Code. None has merit, and none support the imposition of a *per se* bad faith rule proposed here.[11]

[11] It bears noting that, based upon the Petitioning Creditors' review of the record, Hildene never suggested to the Bankruptcy Court that it should implement a rule to deem as *per se* bad faith the filing of an involuntary

1. *A nonrecourse creditor may file an involuntary petition*

Throughout its Brief, Hildene presumes as "truth" that an involuntary chapter 11 petition cannot be filed by secured nonrecourse creditors, and thus argues that the Petitioning Creditors were not permitted to file the Petition. See, e.g., Hildene Brief at pp. 1-2 ("Secured non-recourse creditors are ineligible under the Bankruptcy Code to be the only petitioning creditors to file an involuntary petition."). In support of this proposition, Hildene relies upon tortured readings of the relevant statutes and citation to inapplicable decisions. However, because section 303(b) is unambiguous on its face, "the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." Lamie, 540 U.S. at 534. See also United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240-41 (1989).

Section 303(b)(1) provides that

> [a]n involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title – (1) by three or more entities, each of which is either a holder of a **claim against such person** that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, **if such noncontingent, undisputed claims aggregate at least $14,425 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims**.

11 U.S.C. § 303(b)(1) (emphasis added). Hildene claims nonrecourse creditors are ineligible to file an involuntary bankruptcy petition because, "as a matter of applicable non-bankruptcy law (here, New York), nonrecourse creditors hold no rights against a person, but only rights against the property securing the obligations owed to the creditor." Hildene Brief at p. 26. However, that analysis is not relevant and otherwise ignores the Supreme Court's teachings in Johnson v. Home State Bank, 501 U.S. 78 (1991), relating to the significance (or lack thereof) of a claim

---

bankruptcy by a creditor who did not qualify under section 303(b). It is well-established in the Third Circuit that "absent compelling circumstances an appellate court will not consider issues that are raised for the first time on appeal." Shell Petroleum, Inc. v. United States, 182 F.3d 212, 219 (3d. Cir. 1999).

being characterized as non-recourse. In Johnson, the Supreme Court noted that even a nonrecourse claim constituted a "claim" against a debtor under section 102(2) of the Bankruptcy Code. Id. at 83, 86-87. In reaching this conclusion, the Supreme Court distinguished between nonrecourse and recourse claims and explained that the difference between the two types of claims lay not in who or what the claim may be against, but how the claim may be enforced. Specifically, the Supreme Court determined that a non-recourse claim remains a claim against a person but may only be enforced *in rem* and not *in personam*. Id. at 84.

Section 303(b)(1) does not state that a petitioning creditor must have a claim against such person *in personam*. Nor does the statute state that the claim must be against a person's personalty. The statute also does not state that the claim must be with recourse. The statute does not even state that the petitioning creditor must have a claim that is capable of being allowed in a bankruptcy case under section 502 of the Bankruptcy Code, or otherwise. All that is required is that the petitioning creditor have a claim against the person who is the subject of the petition. Here, pursuant to Johnson, each Petitioning Creditor clearly has a claim against the Debtor.

Additionally, Hildene suggests that "only creditors holding unsecured claims may be qualifying petitioning creditors." Hildene Brief at p. 25. No such requirement is included in section 303(b)(1). The word "unsecured" does not even appear in section 303(b)(1). By its plain language, section 303(b)(1) requires three or more petitioning creditors having claims that, in the aggregate, are in an amount at least $14,425 more than the value of any claim on the property of the debtor. Said another way, to the extent a petitioning creditor is secured, the statute by its express terms requires that the petitioning creditor be merely undersecured, not entirely unsecured.

Even if the Court were to find the language in section 303(b) ambiguous, it would need to take into consideration section 1111(b) of the Bankruptcy Code. Under that section, nonrecourse claims are allowed or disallowed "the same as if such holders had recourse against the debtor on account of such claim, whether or not such holder has such recourse. . . ." 11 U.S.C. § 1111(b)(1)(A). Because chapter 11 allows nonrecourse and recourse claims to be treated the same for allowance purposes, the two courts to consider the issue have held that holders of nonrecourse claims may qualify as petitioning creditors in a chapter 11 case. See In re East-West Assocs., 106 B.R. 767, 770 (S.D.N.Y. 1989) (holding that a nonrecourse creditor may hold an unsecured deficiency claim and act as petitioning creditor in chapter 11 involuntary proceeding); In re Sundown Assocs., 150 B.R. 156, 159 (Bankr. E.D. Va. 1992) (same).

Hildene ignores or criticizes these decisions and, instead cites CC Britain Equities, L.L.C. v. Allen-Main Assocs. Ltd. (In re Allen-Main Assocs. Ltd.), 223 B.R. 59, 63 (B.A.P. 2d Cir. 1998), to support the opposite. Hildene Brief at p. 27-28. That decision, however, applies to a chapter 7 case as the Allen-Main Court explicitly acknowledged, its ruling would not reach chapter 11 cases, since "[i]t is true that in chapter 11 the Code does not make a distinction between recourse and nonrecourse claims. Section 1111(b)(1) allows a deficiency claim, whether the underlying debt is recourse or nonrecourse." 223 B.R. at 63. Accordingly, Allen-Main actually undermines Hildene's position in this chapter 11 case.[12]

---

[12] Hildene asserts that reliance on section 1111(b) of the Bankruptcy Code is improper since "in the chapter 11 context a secured creditor has the right to elect to have a non-recourse claim be treated as recourse." Hildene Brief at p. 28. Yet, Hildene gets section 1111(b) backwards. That section provides that a secured creditor's claim is treated as recourse in nature by default. 11 U.S.C. § 1111(b)(1)(A). The secured creditor's claim is only treated as non-recourse in nature if a supermajority of the class of such secured claims elects to treat their claims as non-recourse in connection with a specific plan of reorganization. Id. The section 1111(b) election is plan specific and an election does not bind the nonrecourse creditor to elect on all other bankruptcy plans. See, e.g., In re Century Glove, Inc., 74 B.R. 958, 961 (Bankr. D. Del. 1987). Thus, even if such an election were made, it would not apply to alternative plans of reorganization.

Finally, because section 303(b)'s statutory language is unambiguous, there is no need for this Court to consider the policy concerns that Hildene claims support its position to bar non-recourse creditors from instituting bankruptcy proceedings. See Lamie, 540 U.S. at 534.

Nonetheless, Hildene argues that nonrecourse creditors should not be petitioning creditors because this would give nonrecourse creditors rights that they would not have outside of bankruptcy. Hildene Brief at p. 29. However, section 1111(b), by its very language, gives nonrecourse creditors greater rights than they have as a matter of contract or under state law. See 1111(b)(1)(A); L. King, COLLIER ON BANKRUPTCY at ¶ 1111.03[1] (15th ed. rev. 2006) ("Section 1111(b)(1)(A) is an exception to the general rule that bankruptcy law respects nonbankruptcy entitlements."). Hildene also claims that the Appealed Order may incentivize the filing of involuntary chapter 11 cases, rather than chapter 7 cases, notwithstanding that there is an absence of hope for reorganization. Hildene Brief at p. 30. But, as the Bankruptcy Court acknowledged, it is well-established that an orderly and opportunistic liquidation of claims and assets is a valid purpose of a chapter 11 proceeding. See Opinion at p. 12 (citing 11 U.S.C. §1123(b)(4) ("a plan may – provide for the sale of all or substantially all of the property of the estate, and the distribution of proceeds of such sale among holders of claims or interests"); In re PPI Enters. (U.S.), Inc., 324 F.3d 197, 211 (3d Cir. 2003) (noting that the liquidation of assets may be an appropriate use of chapter 11 bankruptcy as the Bankruptcy Code clearly contemplates liquidating plans under section 1123(b)(4)); In re Integrated Telecom Express, Inc., 384 F.3d at 120 n.4 (where a debtor and/or petitioners seek to implement a plan that liquidates the assets of the debtor, a valid bankruptcy purpose is served where the petition might reasonably maximize the value of the bankruptcy estate).

2. *The Petitioning Creditors did not violate the Indenture by commencing the involuntary case*

As its last-ditch, belated attack on the Order for Relief, Hildene claims that the Bankruptcy Court erred in not finding bad faith because the petition was allegedly filed in violation of the Indenture. Hildene Brief at p. 34. AFGI raises similar arguments. AFGI Brief at pp. 27-29. As a matter of law, the Bankruptcy Court found that, even if true, use of the Bankruptcy Code to supersede burdensome indenture provisions is not indicative of bad faith. The Bankruptcy Court cited to sections 365(a) and 1123(b) of the Bankruptcy Code – two provisions that permit bankruptcy trustees to reject executory contracts to which they are parties – and noted that debtor may file petitions for the purpose of avoiding prepetition contractual arrangements. Opinion at p. 14. Indeed, many courts have acknowledged that an insolvent debtor may file for bankruptcy for that very purpose. See, e.g., In re Central Jersey Airport Services, LLC, 282 B.R. 176, 181-82 (Bankr. D.N.J. 2002) (declining to dismiss a bankruptcy case where it was alleged that the debtor filed in order to reject a contract); In re Balboa Street Beach Club, Inc., 319 B.R. 736, 740 (S.D. Fla. 2005) ("[T]here is no such thing as 'bad faith' in bringing a bankruptcy case solely for the purposes of rejecting an overly burdensome executory contract."); In re W&L Assoc's, Inc., No. 86-04999S 1988 WL 47598 (Bankr. E.D. Pa. May 10, 1988) (denying a motion to dismiss on the grounds that the case was filed for the principal purpose of avoiding an agreement of sale).

Furthermore, as acknowledged by the Bankruptcy Court and discussed supra at section II, the Indenture did not restrict the Petitioning Creditors from filing the Petition. Opinion at p. 15. Hildene nonetheless claims that section 5.13 of the Indenture restricts Senior Noteholders' rights to file an involuntary petition because that provision grants the majority of a controlling class the rights of the Trustee, and, under the section 5.4 of the Indenture, the Trustee can only file an

involuntary petition in limited circumstances. Hildene Brief at p. 36. However, while section 5.13 of the Indenture grants the majority of a controlling class the rights of the Trustee,[13] it does not limit the Senior Noteholders' remedies to those of the Trustee. In fact, section 5.11 of the Indenture makes clear that the rights and remedies conferred in the Indenture are not exclusive, and that every right and remedy may be cumulative and in addition to every other right given or existing at law or in equity.[14] Moreover, section 5.9 of the Indenture permits Senior Noteholders to institute Proceedings to collect principal and interest owed to them, and such right is not limited by sections 5.4, 5.5, or 5.13 of the Indenture. Taken together, these provisions clearly enable Senior Noteholders to file an involuntary bankruptcy proceeding to ensure they are repaid the amounts they are owed.

*3. The Appealed Order does not violate section 510(a) of the Bankruptcy Code*

Finally, Hildene claims that by refusing to dismiss the case the Bankruptcy Court allowed a violation of section 510(a) of the Bankruptcy Code. Essentially, Hildene's argument is that, because section 510(a) provides that "a subordination agreement is enforceable" in a bankruptcy case, the Bankruptcy Court erred in refusing to enforce the Indenture against the Petitioning Creditors and dismiss the Petition altogether. Hildene Brief at p. 39. First, that argument ignores the law, cited above, establishing that the legitimacy of a petition becomes irrelevant once an

---

[13] Section 5.13 of the Indenture provides in part that "a Majority of the Controlling Class shall have the right following the occurrence, and during the continuance of, an Event of Default to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee . . . " B. Ct. Dckt. 122, Ex. G, Indenture § 5.13.

[14] Section 5.11 of the Indenture, entitled "Rights and Remedies Cumulative" provides in pertinent part:

> No right or remedy herein conferred upon or reserved to the Trustee or to the Senior Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

B. Ct. Dckt. 122, Ex. G, Indenture § 5.11.

order for relief is entered. Thus, whether or not there was a subordination violation would not affect whether the case should proceed. Second, and equally important, the Indenture, as a whole, is simply not a subordination agreement. Hildene Brief at p. 38. The provisions in the Indenture that constitute "subordination agreements" are sections 2.8 ("Payment of Principal and Interest and Other Amounts") and 13.1 ("Subordination"). As indicated in those provisions, each provides for subordination for the benefit of the Senior Noteholders and to the detriment of the Junior Noteholders. The Indenture does not include any such provision that binds or subordinates the rights of Senior Noteholders to those of Junior Noteholders. As such the subordination argument fails.

## CONCLUSION

For all of the reasons set forth above, the Court should deny the appeal, affirm the Appealed Order, and grant such other relief to the Petitioning Creditors as is appropriate under the circumstances.

Dated: September 29, 2011
New York, New York

**FOX ROTHSCHILD LLP**

By: /s/ Richard M. Meth
Richard M. Meth
75 Eisenhower Parkway, Suite 200
Roseland, New Jersey 07068

-and-

J. Christopher Shore
Gerard Uzzi
**WHITE & CASE LLP**
1155 Avenue of Americas
New York, New York 10036-2787

*Counsel for GRF Master Fund, L.P., Anchorage Illiquid Opportunities Offshore Master, L.P. and Anchorage Capital Master Offshore, Ltd.*